UNITED STATES, Appellee,

v.

William J. BIRDSALL, Master Sergeant,
U.S. Air Force, Appellant.

No. 96–0913.
Crim.App. No. 30825.

U.S. Court of Appeals for
the Armed Forces.

Argued Oct. 7, 1997.

Decided Jan. 22, 1998.

For Appellant: *Mark T. O'Brien* (argued); *Lieutenant Colonel Kim L. Sheffield* and *Captain Harold Vaught* (on brief); *Colonel David W. Madsen.*

For Appellee: *Captain Mitchel Neurock* (argued); *Lieutenant Colonel Michael J.*

*Breslin* and *Major Allen G. Erickson* (on brief); *Colonel Brenda J. Hollis.*

*Opinion of the Court*

SULLIVAN, Judge:

During July of 1993, appellant was tried by a general court-martial composed of officer members at Plattsburgh Air Force Base, New York. Contrary to his pleas, he was found guilty of one specification each of sodomy, committing indecent acts, and taking indecent liberties on divers occasions with children under the age of 16, in violation of Articles 125 and 134, Uniform Code of Military Justice, 10 USC §§ 925 and 934, respectively. He was sentenced to a bad-conduct discharge, confinement for 10 years, total forfeiture, and reduction to pay grade E–1. On October 4, 1993, the convening authority approved the sentence. On March 29, 1996, the Court of Criminal Appeals affirmed in an unpublished opinion.

This Court granted review on the following issues of law on March 31, 1997:

I

WHETHER THE MILITARY JUDGE ERRED WHEN, OVER OBJECTION, SHE PERMITTED TRIAL COUNSEL TO CROSS–EXAMINE APPELLANT AS TO HIS HISTORY OF SEXUAL ABUSE, ELICITING TESTIMONY THAT APPELLANT, AS A JUVENILE, HAD BEEN FORCED AT KNIFE POINT TO PERFORM ORAL SODOMY, WHERE SUCH TESTIMONY WAS IRRELEVANT AND HIGHLY PREJUDICIAL.

II

WHETHER THE IMPROPER ADMISSION OF UNCHARGED MISCONDUCT TESTIMONY RELATING TO APPELLANT'S ANAL SEX WITH HIS WIFE, COUPLED WITH TRIAL COUNSEL'S IMPROPER ARGUMENT ATTRIBUTING TO APPELLANT A "PASSION" FOR ANAL SEX, AND LINKING THIS "PASSION" TO APPELLANT'S DI-VORCE FOR CRUEL AND INHUMAN TREATMENT, WAS PLAIN ERROR.

III

WHETHER THE MILITARY JUDGE ERRED WHEN, OVER OBJECTION, SHE ADMITTED HEARSAY TESTIMONY OF A STATEMENT ATTRIBUTED TO 5–YEAR OLD [JB]: "YOU CAN STICK A HOT DOG UP MY BUTT, I WON'T TELL"; WHICH STATEMENT WAS IMPROPERLY USED TO VOUCH FOR THE CREDIBILITY OF THE REPORTS OF SEXUAL ABUSE.

IV

WHETHER IT WAS PREJUDICIAL ERROR TO PERMIT DR. HICKEY, A MEDICAL DOCTOR AND PROSECUTION EXPERT WITNESS, TO STATE HIS OPINION THAT BOTH CHILDREN WERE SEXUALLY ABUSED.

V

WHETHER IT WAS PLAIN ERROR IN THE TESTIMONY OF PAMELA LANGELIER, A PROSECUTION EXPERT, TO ADMIT SEVERAL OPINIONS EVALUATING THE CREDIBILITY OF THE VICTIMS, INCLUDING AN OPINION THAT BOTH CHILDREN WERE SEXUALLY ABUSED AND THE VICTIMS OF INCEST.

VI

WHETHER THE MILITARY JUDGE COMMITTED PREJUDICIAL ERROR WHEN SHE PERMITTED TRIAL COUNSEL, OVER OBJECTION, TO SUGGEST THAT APPELLANT HAD A BURDEN TO INVESTIGATE ANOTHER POTENTIAL SUSPECT AND SUBSEQUENTLY, IN RESPONSE TO A MEMBER'S QUESTION, PERMITTED ASSISTANT TRIAL COUNSEL, RATHER THAN A SWORN WITNESS, TO TELL THE MEMBERS WHAT SHE KNEW ABOUT THE INVESTIGATION OF THE POTENTIAL SUSPECT.

## VII

WHETHER THE MILITARY JUDGE'S REFUSAL TO ADMIT APPELLANT'S POLYGRAPH EVIDENCE BASED SOLELY ON MIL.R.EVID. 707 DENIED HIM HIS CONSTITUTIONAL RIGHTS OF DUE PROCESS AND A FAIR TRIAL UNDER THE CIRCUMSTANCES OF THIS CASE WHERE APPELLANT TESTIFIED CONSISTENTLY WITH HIS POLYGRAPH RESULTS, TRIAL COUNSEL IMPUGNED APPELLANT'S CREDIBILITY, AND THE JURY HEARD RUTH BIRDSALL, APPELLANT'S FORMER WIFE AND ACCUSER, TESTIFY IN RESPONSE TO A QUESTION FROM TRIAL COUNSEL THAT SHE WAS WILLING TO TAKE A POLYGRAPH.

We hold that the military judge erred in allowing Dr. Langelier to testify in effect that appellant's sons were telling the truth and were victims of incest, and permitting Dr. Hickey to testify to his opinion that these children were victims of sexual abuse. *United States v. Harrison*, 31 MJ 330, 332 (CMA 1990); *United States v. Arruza*, 26 MJ 234, 239 (CMA 1988); *see United States v. Whitted*, 11 F.3d 782, 785 (8th Cir.1993).

Evidence in the record shows that appellant and his wife, Ruth, were divorced in January of 1992. Appellant received custody of their 5–year–old son, B, and Ruth was granted custody of J, their other son who was 4. Later that same year, however, the couple agreed to try to salvage the marriage. Appellant then planned a family trip to Colorado to explore that location as a place to retire. Shortly before the family's anticipated departure, Ruth decided not to go. Appellant went to Colorado on his own in late December of 1992.

While in Colorado, appellant heard from his wife by telephone that B had been acting and speaking in sexually inappropriate ways. When appellant inquired, B told him that his sexual knowledge and behavior came from Mr. F, his gym teacher. Appellant decided to return home immediately. Traveling by car, the trip back took him 3 days. Meanwhile, Ruth took her sons to a social worker

and a doctor, and then arranged for them to be examined on January 8, 1993, by a psychologist who specialized in sexual-abuse cases.

When appellant returned home on January 7, 1993, his wife informed him that she was taking the children to a doctor in Vermont the next day. Prior to going to Vermont, both children denied all suggestions that they may have been sexually abused. Medical examinations revealed no physical evidence of abuse.

On January 8, 1993, Dr. Langelier, a certified psychologist, and her associate, Eva Eller, examined B and J. They placed the children in two different rooms and interviewed them separately. During the initial interview, B gave no indication that he had been abused. J, however, informed Dr. Langelier that he had seen his father touch B in a bad way. Thereafter, B was confronted with his younger brother's statement and admitted to the acts which resulted in the charges for which appellant was convicted. Using anatomically correct dolls, B demonstrated how he had been touched by his father.

B testified at trial that his father committed anal sodomy upon him and touched his "peeper" about 50 times. He also stated he had committed anal sodomy upon his father about 40 times. J testified that his father had touched both him and his brother on their "butts" with his finger once. Both Dr. Langelier and Ms. Eller testified as expert witnesses and revealed what they had been told by B and J during their evaluations. Furthermore, Dr. Hickey, a government expert in pediatrics, and Dr. Langelier, an expert in child abuse, ultimately opined that both children were victims of sexual abuse, notwithstanding a lack of physical evidence. Appellant testified and denied all allegations.

Dr. Hickey testified for the Government as an expert in pediatrics. Relevant portions of his testimony are as follows:

Q: Okay. Now you said a little earlier that you've performed medical evaluations on more than two hundred children who were the victims of sexual abuse. Okay. Comparing the standard behaviors and findings of those two hundred children, in your opinion, do these two children exhibit

behavior and evaluations consistent with children of child sexual abuse?

DC: I would object as far as the actual physical findings versus the conclusions that the doctor reached as far as that interview.

ATC: I'm asking for an overall comparison based on his opinion. He has been qualified as an expert on child abuse.

MJ: I don't understand your objection.

DC: Well, the objection is—is the conclusion based upon the normal findings of a physical examination or upon the history given?

MJ: Okay. Why don't you clarify the question asked for defense counsel?

ATC: All right. Doctor Hickey, if you could go back. You performed a medical evaluation on both [B] and [J], did you not?

A: Yes, I did.

Q: From your evaluation in whole, not just the normal findings physically or the history—as a whole, looking at [B] and [J] separately, comparing what you saw from [B] and [J] with the two hundred other children who are the victims of child sexual abuse that you've performed medical evaluations on—*[B] and [J], did they exhibit behavior consistent with victims of child sexual abuse?*

A: *Yes.*

Q: *In your opinion, are they the victims of child sexual abuse?*

DC: Objection. That calls for a conclusion. That's for the panel to conclude, not the witness here. He's not an expert in the ultimate issue of the facts here.

ATC: The ultimate issue in fact is who did it and what was done to them. I'm asking this particular witness to describe what he observed and what his opinion is of what he observed.

MJ: Well, I will allow the question.

ATC: *In your opinion, Doctor Hickey, are these children the victims of child sexual abuse?*

A: *Based on these findings—*

Q: *In your opinion.*

A: *I can't say with a hundred percent certainty. But, in my opinion, I would say yes.*

(Emphasis added.)

Dr. Langelier testified for the Government as an expert in psychology and child abuse. The record states:

Q. Now, Doctor Langelier, in reviewing your publications, I'm also aware, among the twenty-two in your curriculum vitae, along with the interview of the child sexual abuse victim, *you have also done work, and I imagine research, about unfounded sexual abuse allegations?*

A. *Yes. I made a video tape on that.*

Q. A University of Vermont production in 1988?

A. Correct.

Q. And are you, from your own experience, familiar with such cases?

A. Yes, I am.

Q. *And are you aware of what to look for in a case in order to do a balanced, even determination of whether it's a founded or unfounded case?*

A. *Yes.*

Q. *What are some particular markers or indicators within your field of the unfounded case?*

\* \* \*

Q: ... And because you are an expert, the rules allow you to give us your opinion based on your expertise.... *Are there any indications, given your evaluation in this case, that coaching has been the cause of the children's revelations?*

A: *No.*

Q: Why not?

A: Because of the different areas that I look at to screen in or screen out coaching. And in this particular case, the boys gave descriptions about what they saw or experienced that were equal to their developmental level or stage.... *They had emotions of sadness. There was clearly shame. They could not feign those emotions of sadness or shame. Those emotions could not be programmed into them to occur right when they should during the interview.... Children cannot be taught*

*to spontaneously lie on paper at that age. And the drawings that they did were of abuse. The drawings came from their minds. The drawings were drawings that fit what one said about the other. They— in this particular case, one witnessed the other's abuse. They were consistent with each other's statements in general. And they showed that hesitation that you don't see usually in programmed children to disclose, nor did they disclose things that they had memorized because their disclosures came out sporadically. They did not have a good command of everything that happened with the frequency count. There was—the idiosyncratic descriptions, I think, were the most compelling, along with the descriptions that were developmentally age appropriate.*

\* \* \*

Q: Now after your evaluations [of B] ... did you ... come to a conclusion about post-traumatic disorder as it relates to [B]?

A: After reviewing all of the documentation, it was my opinion that he certainly had a stress syndrome, and the only stress syndrome that would fit was PTSD.

Q: *So that would be post-traumatic stress disorder?*

A: *Yes.*

Q: *Resulting from what, given your analysis?*

A: *My analysis was that it was caused by sexual assault, and he named his father as the offender.*

\* \* \*

Q: *And in your opinion, is this a founded or an unfounded case of sexual abuse?*

A: *What do you mean by founded?*

Q: That was going to be my question. Ah, you make a determination, don't you, ultimately in your professional evaluation, after looking at all of the facts and analyzing them?

A: Yes.

Q: Okay. And what is your determination?

A: *My determination is that [B] is a child who was sexually abused, and that*

*he fits the profile commonly seen of children who have been sexually abused. And he had named only one person as the offender, his father. So, my opinion was that he was the victim of incest.*

Q: *And as to [J], any final opinion?*

A: *My opinion is that [J] was coerced into sexual behavior with his brother, that involved coercion so that it was more than sexual play or more than exploratory play. It was more like a compulsion for [B] to have sex with [J], to act out what had happened to he (sic), [B]. My opinion is that [J] probably was sexually abused also and a victim of incest other than his brother. That's my opinion.*

Q: Given the amount of time that [J] said he had witnessed the accused with his brother, [B], do you have an opinion as to whether or not the accused was aware of his presence during the witnessing?

A: *My opinion is that the father was aware that both boys were witnesses to abuse, and that the father was aware that [J] was watching some of the time.* [J] also described how he would hide behind a wall in the kitchen, to watch at least one event. And I would assume that some of the time a child of that age would not be that clever, and the house would not be that equipped to hide somebody from watching.

(Emphasis added.)

———

Our concern in this case is drawn immediately to Issues IV and V. Both of these issues address the proper scope of an expert's testimony in general (*see* Mil.R.Evid. 700–707, Manual for Courts–Martial, United States, 1984) and its correct application in cases of child sexual abuse. *See generally Maryland v. Craig,* 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990); *cf. Coy v. Iowa,* 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988) (discussing child abuse cases and special due process concerns). We do not write on a clean slate in this area and, accordingly, we must resolve these issues under our precedent. *See generally United States v. Harri-*

*son, supra,* and *United States v. Petersen,* 24 MJ 283 (CMA 1987).

■ Issue IV concerns the testimony of a prosecution expert, Dr. Hickey, that appellant's sons, B and J, were the "victims of child sexual abuse." Defense counsel objected to such testimony on the basis that it was the members' job to determine whether the boys were sexually abused and this witness had no expertise in determining the "ultimate issue in fact" in this case. Trial counsel responded that this expert should be permitted to "describe what he observed and what his opinion is of what he observed," even if it goes to the ultimate issue of fact.

The Eighth Circuit in *Whitted,* 11 F.3d at 785, succinctly commented on the type of testimony an expert in child abuse may offer in a child sexual abuse case:

> In the context of child sexual abuse cases, a qualified expert can inform the jury of characteristics in sexually abused children and describe the characteristics the alleged victim exhibits. *United States v. St. Pierre,* 812 F.2d 417, 419–20 (8th Cir.1987). A doctor who examines the victim may repeat the victim's statements identifying the abuser as a family member if the victim was properly motivated to ensure the statements' trustworthiness. *United States v. Renville,* 779 F.2d 430, 436, 438–39 (8th Cir.1985); Fed.R.Evid. 803(4). A doctor can also summarize the medical evidence and express an opinion that the evidence is consistent or inconsistent with the victim's allegations of sexual abuse. *See United States v. Azure,* 801 F.2d 336, 340 (8th Cir.1986)(dicta); *see also United States v. Provost,* 875 F.2d 172, 176 (8th Cir.), *cert. denied,* 493 U.S. 859, 110 S.Ct. 170, 107 L.Ed.2d 127 (1989). *Because jurors are equally capable of considering the evidence and passing on the ultimate issue of sexual abuse, however, a doctor's opinion that sexual abuse has in fact occurred is ordinarily neither useful to the jury nor admissible. E.g., Johnson v. State,* 292 Ark. 632, 732 S.W.2d 817, 821 (1987); *Commonwealth v. Mendrala,* 20 Mass.App. 398, 480 N.E.2d 1039, 1042

(1985); *State v. Saldana,* 324 N.W.2d 227, 231 (Minn.1982); *Stephens v. State,* 774 P.2d 60, 66–67 (Wyo.1989); *see Goodson v. State,* 566 So.2d 1142, 1146 (Miss.1990) (citing other states' decisions banning expert opinion testimony that a child has been sexually abused).

We agree and conclude that error occurred in this case with respect to the challenged testimony of Dr. Hickey. *See Harrison,* 31 MJ at 332 ("An expert may testify as to what symptoms are found among children who have suffered sexual abuse and whether the child-witness has exhibited these symptoms."); *see generally* Mil.R.Evid. 701 (opinion evidence admissible which is "helpful to a clear understanding of ... the determination of a fact in issue").

■ Issue V concerns the testimony of a second prosecution expert, Dr. Langelier, that B's and J's allegations of sexual abuse by their father were neither unfounded nor coached. She also testified that it was her opinion that these boys were victims of incest. Defense counsel did not object to this testimony. However, we note that his earlier objection to similar testimony from Dr. Hickey had just been denied by the military judge.

Mil.R.Evid. 103 states:

### Rule 103. Ruling on evidence

(a) *Effect of erroneous ruling.* Error may not be predicated upon a ruling which admits or excludes evidence unless the ruling materially prejudices a substantial right of a party, and

(1) *Objection.* In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context;

\* \* \*

(d) *Plain error.* Nothing in this rule precludes taking notice of plain errors that materially prejudice substantial rights although they were not brought to the attention of the military judge.

Here, the military judge was on notice that the defense objected to admission of prosecu-

tion-expert-opinion testimony that sexual abuse had occurred. However, she was not on notice that the defense objected to prosecution expert testimony that the alleged victims were telling the truth. Therefore, we must review this question under a plain-error standard. Mil.R.Evid. 103(d).

■ If anything is established in the area of expert testimony in child abuse cases, it is that the expert in child abuse may not act as a human lie detector for the court-martial. This Court has made clear that child-abuse experts are not permitted to opine as to the credibility or believability of victims or other witnesses. *See Harrison*, 31 MJ at 332; *Arruza*, 26 MJ at 237; *Petersen*, 24 MJ at 284–85. Such an opinion violates Mil.R.Evid. 608(a)'s limits on character evidence and exceeds the scope of the witness' expertise, for the expert lacks "specialized knowledge . . . to determine if a child-sexual-abuse victim was telling the truth." *See U.S. v. Arruza* and *U.S. v. Petersen*, both *supra.*

An expert's opinion evaluating the truthfulness of a witness' story also usurps the jury's exclusive function to weigh evidence and determine credibility. *See U.S. v. Harrison, supra; Arruza, supra* at 239 (separate opinions of Sullivan, J., and Everett, C.J.). Our position on this question is consistent with well-established practice in federal civilian trial courts. *See Whitted*, 11 F.3d at 785–86 (doctor cannot pass judgment on alleged victim's truthfulness in the guise of medical opinion), citing *Azure*, 801 F.2d at 339–41.

Dr. Langelier's testimony as adduced by the prosecution clearly violated the above proscription. First, she expressly testified that the two boys in this case were victims of incest by their father, appellant. Second, she made clear that her opinion in this regard was based in large part on the statements made by the boys concerning the alleged acts of their father. Finally, she prefaced this testimony with an assertion that she was qualified to distinguish between founded and unfounded cases of child sexual abuse. This Court has repeatedly held that testimony which is the "functional equivalent" of an expert's opinion that the victim should be believed is inadmissible.

*See United States v. Marrie*, 43 MJ 35, 41–42 (1995); *U.S. v. Harrison* and *U.S. v. Petersen*, both *supra.*

■ The final question we must decide is whether appellant was substantially prejudiced by the military judge's errors in admitting expert-opinion testimony that he had sexually abused his sons and that these boys were telling the truth. *See United States v. Adams*, 44 MJ 251, 252 (1996); *United States v. Prevatte*, 40 MJ 396, 397 (CMA 1994). This case boiled down to a credibility contest between a 6–year–old boy and a 5–year–old boy and their father. B testified that appellant touched his "peeper" 50 times; that appellant made him and J stick their "peepers" in his "butt" 40 times; and that appellant put his "peeper" in B's "butt" 50 times. However, there was no evidence of physical trauma to the anus of B (45 lbs) from the alleged anal sodomies by appellant (215 lbs). Moreover, J testified that he only saw his father touch B on the "butt" once. Finally, appellant took the stand and unequivocally denied the charged sexual abuse and testified that his wife or mother-in-law coached the boys in their testimony.

■ Normally, expert testimony that a victim's conduct or statements are consistent with sexual abuse or consistent with complaints of sexually abused children is admissible and can corroborate an alleged victim in a significant way. *United States v. Suarez*, 35 MJ 374, 376–77 (CMA 1992); *see Whitted, supra* at 786. Nevertheless, to say as a matter of expert opinion that sexual abuse occurred and a particular person did it crosses the line of proper medical testimony and imparts an undeserved scientific stamp of approval on the credibility of the victims in this case. *Id.* Here, the inadmissible testimony came from two doctors, magnifying its impact on the members in an extremely close case. *See U.S. v. Harrison, supra.* Moreover, Dr. Langelier's testimony was focused directly on the key issue in this trial, *i.e.,* the boys' credibility. *See U.S. v. Petersen, supra.* Accordingly, the prejudice in this case is clear.

Since there is prejudicial error, we must reverse this case. This is a hard but necessary case to reverse. It is extremely impor-

tant that a trial be free from undue influence on a jury's role in determining the ultimate facts in the case. Improper medical testimony on credibility cannot be allowed. The jury must be free from this type of influence if it is to be fair.*

The decision of the United States Air Force Court of Criminal Appeals is reversed.

The findings of guilty and sentence are set aside. The record of trial is returned to the Judge Advocate General of the Air Force. A rehearing may be ordered. Art. 67(e), UCMJ, 10 USC § 867(e).

Chief Judge COX and Judges CRAWFORD, GIERKE and EFFRON concur.

---

* We share the concerns of the court below about the remaining issues, but we need not resolve them in this case.