# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
CAMPANELLA, CELTNIEKS, and PENLAND
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Specialist LAURO P. FRANCISCO**
**United States Army, Appellant**

ARMY 20140541

Headquarters, 25th Infantry Division
David Conn, Military Judge (arraignment)
James W. Herring, Jr., Military Judge (trial)
Colonel Mark A. Bridges, Staff Judge Advocate

For Appellant: Lieutenant Colonel Jonathan F. Potter, JA; Major Christopher D. Coleman, JA; Captain Joshua G. Grubaugh, JA (on brief).

For Appellee: Lieutenant Colonel A.G. Courie, III, JA; Major Anne C. Hsieh, JA (on brief).

13 December 2016

----------------------------------
MEMORANDUM OPINION
----------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

CAMPANELLA, Senior Judge:

In this case, we assume a law enforcement officer's opinion as to appellant's truthfulness, offered during direct and re-direct examination, to be impermissible, but find no material prejudice to appellant's substantial rights. We further find that a similar opinion offered by the same law enforcement officer as to appellant's truthfulness on cross-examination, to be the result of invited error, of which appellant may not now complain. We also find that, even assuming we were to consider the latter not to be the result of invited error, the law enforcement officer's opinion does not materially prejudice appellant's substantial rights.

A panel of military officers sitting as a general court-martial convicted appellant, contrary to his pleas, of one specification of aggravated assault and one specification of assault consummated by battery, in violation of Article 128, Uniform Code of Military Justice, 10 U.S.C. § 928 (2012) [hereinafter UCMJ]. The

panel sentenced appellant to a bad-conduct discharge, confinement for thirty months, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority approved only so much of the sentence as provided for a bad-conduct discharge, confinement for twenty-nine months, forfeiture of all pay and allowances, and reduction to E-1. The convening authority also credited appellant with sixty days of confinement credit.

We have reviewed this case pursuant to Article 66, UCMJ. Appellant asserts two assignments of error. We find one issue merits discussion but no relief.

## BACKGROUND

On 18 May 2013, appellant and his boyfriend, Specialist (SPC) GM, went out drinking in Honolulu. Around 0100 in the morning, as SPC GM tried to get appellant to end the evening outing, the two began arguing in the city streets. The argument culminated when appellant struck SPC GM in the head knocking him unconscious. Appellant then left the area–leaving SPC GM lying on the ground. When SPC GM awakened, he unsuccessfully searched for appellant in the surrounding neighborhood and then returned to the home where the two were housesitting for a friend. Appellant was not there.

In the morning, appellant made contact with SPC GM telephonically and requested he pick appellant up and bring him home. Specialist GM obliged. Once back at the house, appellant told SPC GM he spent the night with another man–which led to another heated argument in the kitchen. During the fight, appellant grabbed a kitchen knife and stabbed SPC GM twice in the abdomen. Specialist GM took his shirt off and used it to apply pressure to his abdomen in an attempt to stop the bleeding. Appellant then drove SPC GM to the hospital on post where SPC GM received medical care.

While at the hospital, appellant told the Honolulu police that SPC GM was attacked by three unknown assailants at the nearby McDonald's parking lot while appellant was sitting inside the car and SPC GM was standing outside the vehicle. Appellant asserted the assailants ran off when he got out of the car and confronted them.

The following day, in the presence of appellant, Detective MP interviewed SPC GM who told a story consistent with the story appellant had provided authorities.

Based on these interviews, Detective MP looked for physical evidence of blood in the parking lot. She found none. She quickly obtained the surveillance video footage from a nearby shop, which would have captured the area where appellant described the events to have taken place. Detective MP carefully viewed

over twelve hours of video and found no one on the tape recording matching the description given by appellant and no one running from the area. She then canvassed the area to find possible witnesses who may have seen the events taking place. Again, she found none. Finding nothing to corroborate their story, Detective MP decided to re-interview appellant and SPC GM.

*Direct Examination*

At appellant's court-martial, Detective MP explained on direct examination her attempt to corroborate appellant's story by looking for physical evidence, video surveillance evidence, or eyewitnesses. After finding no corroborating evidence, she testified she found it necessary to re-interview appellant. The direct examination proceeded as follows:

> TC: After you watched the [surveillance] video how did the investigation turn?
>
> WIT: I knew that they weren't telling me the truth. I didn't know what they were not telling the truth about but I went and scheduled an interview to re-interview [appellant] and at this time he became a suspect in my eyes and so did [SPC GM] before [sic] false reporting to us. And so I scheduled an interview for [appellant], I believe the day after I saw the video, the morning after.
>
> TC: And what did you do in that interview?
>
> WIT: I read him his warning of constitutional rights, he waived his rights, provided a statement to me. I got a more detailed statement from him regarding the night before all the way up to the incident and then I began confronting him about the inconsistencies in the stories.

*Cross-Examination*

On cross-examination, Detective MP testified as follows:

> DC: You stated that you knew that they were lying about something but you didn't know what?
>
> WIT: Yes.
>
> DC: And those inconsistencies that you testified [sic] on direct, those were the only consistencies?

WIT:  Yes.

. . .

DC:  During [appellant's] second interview with you he told you that he was telling the truth 12 times?

WIT:  I didn't count.

DC:  You confronted him and told him that he wasn't telling the truth?

WIT:  Yes.

DC:  Then he replied to you each time that it was the truth?

WIT: Yes.

DC:  So he never backed away from his story, correct?

WIT:  Correct.

DC: And you stated that he started to become emotional?

WIT:  Yes.

DC:  But isn't it true by that time you and another officer had interrogated him pretty ineptly?

WIT:  I don't think it was.

DC:  You told him that there was a video of the crime scene, correct?

WIT: Correct.

DC:  That showed nothing?

WIT:  Right.

DC:  You asked him if he wanted to call his chain of command, correct?

WIT:  I think the other sergeant did, yes.

DC:  And at that point that's when [appellant] began not to want to testify anymore, correct?

WIT:  I also–it was more–I don't know if it was like drugs or prostitution, but I was like did it come from a drug deal or prostitution or something and he was like "no" and then you could kind of tell that that was a real "no" versus when he was saying that he was telling the truth.  It looked, it was my perception of course, it looked like it was a fake "I'm telling the truth."

DC:  And so it was after you had confronted him with a series of things?

WIT:  Yes.

*Re-direct Examination*

On re-direct examination, the trial counsel proceeded as follows:

TC:  And so based on your experience as a detective and your experience investigating these crimes what is the lack of individual [sic] in that camera tell you?

WIT:  That somebody was lying.

TC:  They were lying about what?

WIT:  About saying something happened that didn't happen there.

Defense counsel did not object to Detective MPs testimony at trial on direct or re-direct examination.

## LAW AND ANALYSIS

We review a military judge's ruling to admit or exclude evidence for an abuse of discretion. *United States v. White*, 69 M.J. 236, 239 (C.A.A.F. 2010).  Where an appellant did not preserve an issue by making a timely objection, that error will be forfeited in the absence of plain error. *United States v. Knapp*, 73 M.J. 33, 36 (C.A.A.F. 2014) (internal citations omitted).  We review allegations of plain error de novo. *United States v. Brooks*, 64 M.J. 325, 328 (C.A.A.F. 2007).  Under a plain

error analysis, in a case of non-Constitutional error, appellant has the burden of proving:  "(1) an error was committed; (2) the error was plain, clear, or obvious; and (3) the error resulted in material prejudice to a substantial right."  *United States v. Maynard*, 66 M.J. 242, 244 (C.A.A.F. 2008) (internal citations and quotation marks omitted).  The United States Supreme Court has defined error as "[d]eviation from a legal rule . . . unless the rule has been waived."  *United States v. Olano*, 507 U.S. 725, 732-33 (1993).

Where relevant, Military Rule of Evidence [hereinafter Mil. R. Evid.] 608 permits a witness to render testimony in the form of an opinion on another witness's character for truthfulness.  A witness cannot, however, provide "human lie detector" testimony, defined as "an opinion as to whether the person was truthful in making a specific statement regarding a fact at issue in the case."  *United States v. Kasper*, 58 M.J. 314, 315 (C.A.A.F. 2003).  Such testimony exceeds the scope of *any* witness' expertise, violates the limits on the admissibility of character evidence found in Mil. R. Evid. 608(a) and encroaches into the exclusive province of the panel to determine the credibility of witnesses.  *Id.  See also Brooks*, 64 M.J. at 328 n.3.

Even if there is error in the admission of such testimony, reversal of the conviction is not required unless there is a finding of material prejudice to an accused's substantial right.  Such prejudice results when there is "undue influence on a jury's role in determining the ultimate facts in the case."  *United States v. Birdsall*, 47 M.J. 404, 411 (C.A.A.F. 1998).

We evaluate the challenged testimony in context to determine if the witness's opinion amounts to prejudicial error.  *See United States v. Eggen*, 51 M.J. 159, 161 (C.A.A.F. 1999).  We look to several nonexclusive factors to assess whether "human lie detector" testimony has been offered and, if it has, its prejudicial impact:  (1) the role of the government counsel in initiating or furthering objectionable testimony (*Kasper*, 58 M.J. at 316); (2) the role of the defense counsel, particularly if it appears the defense initiated the testimony for strategic reasons (*United States v. Schlamer*, 52 M.J. 80, 86 (C.A.A.F. 1999)); (3) the defense's failure to object (*United States v. Halford*, 50 M.J. 402, 404 (C.A.A.F. 1999)) or request cautionary instructions (*Kasper*, 58 M.J. at 319); (4) whether the witness has been asked for specific conclusions or their opinion about the truth or falsity of another's statements or allegations, or about whether a crime occurred (*United States v. Anderson*, 51 M.J. 145, 151 (C.A.A.F. 1999); (5) whether the testimony in question is on a central or peripheral matter (*Kasper*, 58 M.J. at 320; *United States v. Robbins*, 52 M.J. 455, 458 (C.A.A.F. 2000); *Birdsall*, 47 M.J. at 410); (6) whether the trial was before members or by military judge alone (*Robbins*, 52 M.J. at 458; *United States v. Raya*, 45 M.J. 251, 253-54 (C.A.A.F. 1996)); and (7) the remedial action, if any, taken by the military judge (*Eggen*, 51 M.J. at 161).

It is "the 'exclusive province of the court members to determine the credibility of witnesses.'" *United States v. Knapp*, 73 M.J. 33, 34 (C.A.A.F. 2014) (quoting *Brooks*, 64 M.J. at 328 n.3). Our superior court "has been resolute in rejecting the admissibility of so-called human lie detector testimony, which [it] described as: 'an opinion as to whether the person was truthful in making a specific statement regarding a fact at issue in the case.'" *Brooks*, 64 M.J. at 328 (quoting *Kasper*, 58 M.J. at 315). "If a witness offers human lie detector testimony, the military judge must issue prompt cautionary instructions to ensure that the members do not make improper use of such testimony." *Kasper*, 58 M.J. at 315.

Since defense counsel did not object or request an instruction, the issue is forfeited absent plain error. *See United States v. Powell*, 49 M.J. 460, 463 (C.A.A.F. 1998).

*Direct Examination*

Appellant contends the trial counsel elicited human lie detector testimony from Detective MP. From our perspective, this is a close call as to whether admission of this evidence constitutes plain and obvious error.

Detective MP's testimony: "*I knew they weren't telling me the truth*," arose in the context of explaining the inconsistencies and contradictions in appellant's story and intuitively would have raised questions for the panel about appellant's veracity. The trial counsel did not ask whether Detective MP believed appellant was telling the truth. The testimony focused on Detective MP's development of the investigation and objective facts. We will assume, without deciding, that on direct examination Detective MP should have stopped short of providing her ultimate opinion regarding the veracity of appellant and that this resulted in a plain and obvious error.

Detective MP's statements regarding appellant's truthfulness could be construed as providing her opinion on guilt or innocence and thus became objectionable "human lie detector testimony." As an opinion of the appellant's truthfulness, it could usurp the members' exclusive function of the panel members to weigh evidence and determine credibility themselves. *See Birdsall*, 47 M.J. at 410.

When "human lie detector" testimony is offered, a military judge must issue "prompt cautionary instructions" to the members. *Kasper*, 58 M.J. at 315. Here, defense counsel did not object to the evidence and the military judge did not provide

an instruction.[*]

Our analysis does not, however, end there.  The remaining issue is whether the appellant's substantial rights were materially prejudiced by the absence of such an instruction.  UCMJ art. 59(a).  "Prejudice results when there is 'undue influence on a jury's role in determining the ultimate facts in the case.'" *United States v. Mullins*, 69 M.J. 113, 117 (C.A.A.F. 2010) (quoting *Birdsall,* 47 M.J. at 411).  Our superior court has held no such prejudice exists in human lie detector cases if the record contains other "corroborating evidence," which the members could have relied upon in determining guilt.  *Id*. at 118; *cf. Brooks*, 64 M.J. at 330.  Here, such evidence exists.  In this case, the human lie detector testimony amounted to a small fraction of Detective MP's testimony, did not pervade the entire case, nor was it central to the government's case.  *See United States v. Jackson,* 74 M.J. 710, 717 (Army Ct. Crim. App. 2015).  Based on the circumstances surrounding Detective MP's testimony on direct examination focusing on the development of the investigation, the totality of the evidence presented in the case, and the standard instructions given, we conclude the lack of a specific cautionary instruction did not materially prejudice the substantial rights of the appellant.  *See* UCMJ art. 59(a).

### *Cross-Examination*

During cross-examination, defense counsel tried to elicit from Detective MP that when appellant was interviewed, appellant was adamant that he was telling the "truth" about SPC GM being stabbed by three strangers outside the McDonalds.  Consistent with the defense theory that appellant was being truthful, defense counsel continued to cross-examine Detective MP with questions to support this theory.  After being asked about appellant stopping the interview, Detective MP said appellant's assertions of "I'm telling the truth" looked "*fake*," when juxtaposed to other responses that looked truthful.  Assuming without deciding that Detective MP improperly provided human lie detector testimony by opining that appellant's assertions of truth looked "fake," and that such error was plain and obvious, we do not find reversible error.  Here, the introduction of human lie detector evidence at trial was invited by defense counsel.  *See United States v. Martin*, 75 M.J. 321, 325 (C.A.A.F. 2016).  The question of whether defense counsel invited an error at trial is a question of law, which we review de novo.  *Martin*, 75 M.J. at 325.  The invited

---

[*] Although the military judge did not intervene with an instruction, he did ultimately and properly instruct the members on their responsibilities.  He instructed the panel that "each of you must resolve the ultimate question of whether the accused is guilty or not guilty" and that "the final determination as to the weight of the evidence and the credibility of the witnesses in this case rests solely upon you."  In the absence of evidence to the contrary, the members are presumed to follow the military judge's instructions.  *United States v. Holt*, 33 M.J. 400, 408 (C.M.A. 1991) (citing *United States v. Ricketts*, 1 M.J. 78, 82 (C.M.A. 1975)).

error doctrine prevents a party from "creat[ing] error and then tak[ing] advantage of a situation of his own making [on appeal]." *Eggen*, 51 M.J. at 162 (internal quotation marks omitted). As a result, appellant's assignment of error fails because "[i]nvited error does not provide a basis for relief." *Raya*, 45 M.J. at 254. Likewise, on re-direct examination, when Detective MP concluded "*someone wasn't telling the truth*," trial counsel had gone too far by soliciting this response, but the defense cross-examination invited this aspect of the government's re-direct examination. *See Martin*, 75 M.J. at 325. Moreover, defense counsel never objected to the Government's elicitation of human lie detector testimony.

## CONCLUSION

The approved findings and sentence are correct in law and fact, and no error prejudicial to the substantial rights of the appellant occurred. Accordingly, the approved findings and the sentence are AFFIRMED.

Judge CELTNIEKS and Judge PENLAND concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court