*This opinion is subject to revision before publication*

# UNITED STATES COURT OF APPEALS
## FOR THE ARMED FORCES

———————————

**UNITED STATES**
Appellee/Cross-Appellant

**v.**

**Beau T. MARTIN, Sergeant**
United States Marine Corps, Appellant/Cross-Appellee

**Nos. 15-0754 & 16-0122**
Crim. App. No. 201400315

Argued April 6, 2016—Decided June 17, 2016

Military Judges: C. J. Thielemann and E. A. Harvey

For Appellant/Cross-Appellee: *Lieutenant Jacqueline M. Leonard*, JAGC, USN (argued).

For Appellee/Cross-Appellant: *Major Suzanne M. Dempsey*, USMC (argued); *Colonel Mark K. Jamison*, USMC, *Captain Matthew M. Harris*, USMC, and *Brian K. Keller*, Esq. (on brief).

Judge OHLSON delivered the opinion of the Court, in which Judge RYAN and Senior Judge COX joined. Judge STUCKY filed a separate dissenting opinion, in which Chief Judge ERDMANN joined.

———————————

Judge OHLSON delivered the opinion of the Court.

A panel of officer and enlisted members sitting as a general court-martial convicted Appellant/Cross-Appellee [hereinafter Appellant], contrary to his pleas, of one specification of wrongful sexual contact in violation of Article 120(m), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920(m) (2006).[1]

At Appellant's court-martial, both trial defense counsel and trial counsel elicited testimony from the victim's husband about whether he believed his wife's account of the

—————————

[1] The members acquitted Appellant of the greater offense of aggravated sexual assault and of two specifications of wrongful sexual contact, all of which are in violation of Article 120, UCMJ. Appellant's adjudged and approved sentence provided for a reduction to the pay grade of E-1 and a bad-conduct discharge.

sexual encounter. Upon appellate review, the United States Navy-Marine Corps Court of Criminal Appeals held that this testimony constituted inadmissible "human lie detector testimony," but it affirmed Appellant's conviction, concluding that the admission of the testimony did not constitute plain error because it did not materially prejudice Appellant's substantial rights. *United States v. Martin*, No. NMCCA 201400315, 2015 CCA LEXIS 250, at *9–13, 2015 WL 3793707, at *5 (N-M. Ct. Crim. App. June 18, 2015) (unpublished).

We granted review in this case on the following issue:

> Whether the Court of Criminal Appeals erred in holding that the human lie detector testimony offered by the alleged victim's husband was not materially prejudicial.

*United States v. Martin*, 75 M.J. 59, 59 (C.A.A.F. 2015) (order granting review). Following our grant of review, the Judge Advocate General of the Navy certified the following issue for review:

> Did trial defense counsel invite error when he opened the door to human lie detector testimony during the cross-examination of the victim's husband?

*United States v. Martin*, 75 M.J. 109, 109 (C.A.A.F. 2015) (certificate for review).[2]

We hold that under the circumstances of this case, trial defense counsel did invite error when, in the course of conducting cross-examination, he was the first party to elicit human lie detector testimony from the same witness on the same evidentiary point. We therefore answer the certified issue in the affirmative and do not reach the granted issue.

## I. Background

In September of 2011, CI[3] and her husband, Corporal (Cpl) AI, attended a pajama party at Appellant's on-base

---

[2] We heard oral argument in this case at Maxwell Air Force Base, Montgomery, Alabama, as part of the Court's "Project Outreach." *See United States v. Mahoney*, 58 M.J. 346, 347 n.1 (C.A.A.F. 2003). This practice was developed as part of a public awareness program to demonstrate the operation of a federal court of appeals and the military justice system.

home. Appellant was CI's platoon sergeant and direct supervisor at that time. After CI became intoxicated at the party, CI and Cpl AI went to sleep in Appellant's guest bedroom. Cpl AI slept on the side of the bed closest to the wall while CI slept on the side of the bed closest to the bedroom door. CI testified at trial that she awoke to Appellant kneeling by the bed, placing his hand beneath her underwear, and inserting his fingers in her vagina. When CI rolled over to try to wake her husband, Cpl AI told her to stop and to let him sleep. Appellant left the bedroom as CI tried to wake her husband.

At trial, the Government called CI's husband to testify. On direct examination, trial counsel asked Cpl AI about the night of the party, to include the following questions:

> Q. Now, after you fell asleep that night, do you have any recollection of touching your wife in a sexual manner?
>
> A. No, sir.
>
> Q. In your mind, is there any chance that you could've digitally penetrated or put your fingers inside your wife's vagina?
>
> A. No, sir.
>
> Q. Why do you say that?
>
> A. It's never happened before. I have never woken up and just done something like that with my wife….
>
> Q. And you said it has never happened before that. Has anything like that ever happened since that?
>
> A. No, sir.
>
> ….
>
> Q. When you originally talked to NCIS you told NCIS that you thought it possibly could have been you who had touched your wife?
>
> A. Yes, sir.

---

[3] At the time of the events relevant to this appeal, CI was a private first class in the Marine Corps. However, she had separated from the Marine Corps by the time of Appellant's trial. Therefore, this opinion will refer to her as CI.

Q. Why did you say that?

A. I'm the kind of person that if it's even remotely an option I think about it like that. I guess I'm, like, a by-the-numbers-type of person. So, I mean, my wife could have thought about, you know, maybe it could have been another night. But just the way she has been since then, then I know it wasn't me. She wouldn't be acting the way she does nowadays, like, if it would have been me. Even if it was something that she wasn't expecting from me she wouldn't be acting that way.

On cross-examination, trial defense counsel inquired into Cpl AI's doubts about CI's account of the touching:

Q. When she initially told you, she didn't give anything in detail, did she?

A. No, sir.

Q. And you initially thought that maybe she imagined it?

A. I just -- I was kind of in disbelief.

Q. You thought maybe she dreamed it?

A. Something like that, sir, yes.

Q. The story didn't really make too much sense to you?

A. I just figured that if something like that would have happened then …. where was I in this? … [I]f something like that were to happen to me, sir, I would -- I would have stopped it or done something, like, instantly, sir.

….

Q. [A]t no point after [she told you about the assault,] … you never went and reported it to anyone, did you?

A. I honestly … [it's] not like I didn't believe her, sir. But it, kind of, it didn't make too much sense to me….

Q. Okay. So you weren't entirely convinced that this happened then?

A. No, sir.

Q. And you told NCIS that?

A. Yes, sir.

Q. You thought that, hey, maybe … it hap-pened[,] maybe [it] didn't happen?

A. Yes, sir.

Trial counsel did not object to this questioning. Instead, on redirect, trial counsel had this exchange with Cpl AI:

Q. Now, you just told the defense counsel that you had your doubts?

A. Yes, sir.

Q. You do believe your wife, though, correct?

A. I do, sir.

Q. And she's telling the truth?

A. She is, sir.

Q. And why do you think that?

A. The way … that it's affected her, the way that she's changed, the way that it's affected our mar-riage -- the way that it's negatively impacted us just as a family -- we have two kids, we have three dogs, and she's just depressed. And I un-derstand that a mother is, obviously, is stressed out from all that, especially with me deploying again. But even on good days, she'll just snap sometimes. And just the way that it's affected her, something as big as it had on her wouldn't have happened over a small situation, sir.

Trial defense counsel did not object to this testimony. At no point during cross-examination or redirect did the military judge intervene to stop this human lie detector testimony or provide the members with a curative instruction.

## II. Applicable Legal Principles

Human lie detector evidence is elicited when a witness provides "an opinion as to whether [a] person was truthful in making a specific statement regarding a fact at issue in the case." *United States v. Knapp*, 73 M.J. 33, 36 (C.A.A.F. 2014) (citation omitted) (internal quotation marks omitted). "There is no litmus test for determining whether a witness has of-fered 'human lie detector' evidence." *United States v. Jones*, 60 M.J. 964, 969 (A.F. Ct. Crim. App. 2005). If a witness does not expressly state that he believes a person is truthful,

we examine the testimony to determine if it is the "functional equivalent of" human lie detector testimony. *See United States v. Brooks*, 64 M.J. 325, 329 (C.A.A.F. 2007). Testimony is the functional equivalent of human lie detector testimony when it invades the unique province of the court members to determine the credibility of witnesses, and the substance of the testimony leads the members to infer that the witness believes the victim is truthful or deceitful with respect to an issue at trial. *See United States v. Mullins*, 69 M.J. 113, 116 (C.A.A.F. 2010); *Brooks*, 64 M.J. at 329. Human lie detector evidence is inadmissible at a court-martial, *see Knapp*, 73 M.J. at 36, because it is a "fundamental premise of our criminal trial system [that] 'the [panel] is the lie detector'" and "[d]etermin[es] the weight and credibility of witness testimony," *United States v. Scheffer*, 523 U.S. 303, 313 (1998) (quoting *United States v. Barnard*, 490 F.2d 907, 912 (9th Cir. 1973)).

Although it is inadmissible, we will not find reversible error from the introduction of human lie detector evidence at trial when the accused invites its admission. *See United States v. Schlamer*, 52 M.J. 80, 86 (C.A.A.F. 1999); *United States v. Eggen*, 51 M.J. 159, 161–62 (C.A.A.F. 1999); *United States v. Raya*, 45 M.J. 251, 254 (C.A.A.F. 1996). The invited error doctrine prevents a party from "creat[ing] error and then tak[ing] advantage of a situation of his own making [on appeal]." *Eggen*, 51 M.J. at 162 (internal quotation marks omitted) (quoting *Raya*, 45 M.J. at 254). As a result, "[i]nvited error does not provide a basis for relief." *Raya*, 45 M.J. at 254; *United States v. Crigler*, 10 C.M.A. 263, 265, 27 C.M.R. 337, 339 (1959); *United States v. Beer*, 6 C.M.A. 180, 185, 19 C.M.R. 306, 311 (1955). The question of whether trial defense counsel invited an error at trial is a question of law, which we review de novo. *See United States v. Paul*, 73 M.J. 274, 277 (C.A.A.F. 2014) ("This Court reviews questions of law de novo.").

### III. Discussion

We conclude that Cpl AI's testimony on direct examination did not rise to the level of actual human lie detector testimony, nor did it constitute the functional equivalent of human lie detector testimony. We further conclude that although trial counsel did elicit human lie detector testimony

on redirect examination, trial defense counsel invited the error by cross-examining Cpl AI about his doubts regarding CI's account.

Appellant raises two arguments to try to convince us otherwise. First, Appellant suggests that the real reason trial counsel decided to call Cpl AI as a witness was to introduce human lie detector testimony, and thus the Government's improper conduct was the root cause of any error that followed.

We disagree. The Government had a proper purpose in calling Cpl AI to testify—he was a fact witness who attended Appellant's party and could provide the panel members with significant details about the events leading up to the sexual contact, and he was sleeping in the same bed right next to CI when the sexual contact occurred. Had Cpl AI not testified, the members would have understandably speculated about his absence at trial. Further, based on Cpl AI's initial statement to NCIS about the incident, the Government had a legitimate reason to inoculate itself against defense assertions that Cpl AI, not Appellant, was responsible for touching CI. Additionally, it appears that Appellant did not seek to block Cpl AI's testimony at trial for good reason—trial defense counsel wanted to use Cpl AI's own doubts about CI's story to try to create reasonable doubt in the minds of the panel members. Accordingly, we find an insufficient basis to conclude that the Government's decision to call Cpl AI as a witness was for the improper motive of introducing human lie detector testimony, and we find no basis to conclude that this step by the Government somehow invited trial defense counsel to do so.

Second, Appellant argues that the following exchange between trial counsel and Cpl AI on direct examination opened the door to the defense's introduction of human lie detector testimony on cross-examination:

> Q. When you originally talked to NCIS you told NCIS that you thought it possibly could have been you who had touched your wife?
>
> A. Yes, sir.
>
> Q. Why did you say that?
>
> A. I'm the kind of person that if it's even remotely an option I think about it like that. I guess

I'm, like, a by-the-numbers-type of person. So, I mean, my wife could have thought about, you know, maybe it could have been another night. But just the way she has been since then, then I know it wasn't me. She wouldn't be acting the way she does nowadays, like, if it would have been me. Even if it was something that she wasn't expecting from me she wouldn't be acting that way.

Q. And you, kind of, already alluded to this but is this something that is typical in your relationship with your wife?

A. Is what typical, sir?

Q. You know, in the middle of the night touching or penetrating your wife's vagina in this way?

A. No, sir. If anything it would be rolling over. I might put my hand on my wife's chest, on her legs -- on the side of her legs. Like, cuddling, I guess, is the best way to describe it, sir. But nothing of extreme sexual. [sic]

Q. You mentioned that she's been a little different. How has your wife's behavior been different after this assault occurred?

A. She's … always been, like, jumpy if you startled her, like anybody would be. But I remember times, like probably the biggest time -- like I remember is she was … cooking something in the kitchen. Like the stove was on, I came up behind her, I put my arms around and, like she hit … something off the stove just because she freaked out. And probably another, like, main thing I think of is if -- obviously, you can't hear very well in the shower. If I ever, like, walked into the bathroom while she was showering -- she would, like, not scream but like get jumpy just because … she knows it's me. I would assume she knows it's me who is walking in to the room but it just freaks her out.

According to Appellant, this testimony "provide[d] the members an explanation of why [Cpl AI] initially doubted his wife, but grew to believe in the truth of her allegation." Appellant's Reply/Cross Appellee's Answer at 6, *United States v. Martin*, Nos. 15-0754 & 16-0122 (C.A.A.F. Jan. 20, 2016).

We disagree. As even Appellant conceded at oral argument, Cpl AI did not expressly state during direct examination that he believed his wife. *See Knapp*, 73 M.J. at 36. That does not end our inquiry, however. As noted above, even if a witness does not expressly state whether he believes a witness, we examine the witness's testimony to determine if it constitutes the "functional equivalent" of human lie detector testimony.

In applying the functional equivalency standard to the instant case, we note that the relevant portions of Cpl AI's testimony on direct examination can be separated into two categories. First, Cpl AI testified that although he initially had questioned whether he might have digitally penetrated his wife on the night of the incident, he ultimately had concluded that he had not done so. This testimony focused on Cpl AI's own conduct, not on the truthfulness of his wife.

Second, Cpl AI testified about how his wife's behavior had changed since the night of the incident. We conclude that this constituted permissible lay testimony. It was based on Cpl AI's personal knowledge and perceptions of his wife's conduct after the alleged assault. This testimony was not based on specialized or scientific knowledge; Cpl AI merely provided his personal observations of CI's behavior. Therefore, we conclude that Cpl AI's testimony on direct was not the functional equivalent of human lie detector evidence because it did not provide a sufficient inference that he believed CI was being truthful.[4] *See Mullins*, 69 M.J. at 116. Cpl AI's testimony on direct examination was therefore admissible under Military Rule of Evidence 701. *Cf. United States v. Roberson*, 65 M.J. 43, 47 (C.A.A.F. 2007) (holding that witness's opinion of a person's reaction to hearing a statement was admissible lay testimony based on personal observation). As a consequence, we further conclude that by eliciting this testimony on direct examination, the Government did not open the door for the defense to elicit human

---

[4] We recognize that the members might have inferred from Cpl AI's testimony that he believed CI. However, this is not a dispositive factor in our analysis of this case. In any court-martial members might understandably assume that a husband who is testifying at trial on behalf of the prosecution believes his wife is telling the truth about an alleged sexual assault.

lie detector testimony on cross-examination. *Cf. United States v. Savala*, 70 M.J. 70, 71 (C.A.A.F. 2011) (noting that cross-examination may inquire into otherwise inadmissible evidence if the prosecution opens the door on direct examination).

However, as even the Government concedes, its *redirect* questioning of Cpl AI clearly elicited human lie detector testimony by asking Cpl AI whether he believed his wife and whether he thought she was telling the truth. *See Knapp*, 73 M.J. at 36. We therefore must determine whether trial defense counsel invited this error through his cross-examination of Cpl AI.

We conclude that trial defense counsel's cross-examination of Cpl AI invited the admission of the Government's human lie detector evidence. On cross-examination, the defense prodded and probed Cpl AI at considerable length about Cpl AI's initial doubts about his wife's version of events. Specifically, trial defense counsel asked Cpl AI this series of questions:

> Q. And you initially thought that maybe she imagined it?
>
> Q. You thought maybe she dreamed it?
>
> Q. The story didn't really make too much sense to you?
>
> Q. So you weren't entirely convinced that this happened then?
>
> Q. You thought that, hey, maybe -- it happened[,] maybe [it] didn't happen?

Accordingly, it should not have come as a surprise to trial defense counsel that when, in the middle of this series of questions, he asked Cpl AI, "[Y]ou never went and reported [the assault] to anyone, did you," that Cpl AI responded by expressing his view that his wife was being truthful: "[It's] not like I didn't believe her, sir." Under these circumstances, we conclude both that Cpl AI's response constituted human lie detector testimony, and that the questions by trial defense counsel foreseeably elicited that testimony. *See Knapp*, 73 M.J. at 36.

Because trial defense counsel first elicited human lie detector evidence on cross-examination, the invited error doc-

trine precludes Appellant from complaining about the Government's elicitation of this type of evidence on redirect. *See United States v. Baker*, 432 F.3d 1189, 1216 (11th Cir. 2005) ("[A] defendant can 'invite' non-responsive testimony when he insists on pursuing a line of questioning after it becomes apparent that further cross-examination will elicit potentially damaging testimony, and fails to object to the non-responsive answer when it is given."), *abrogated on other grounds by Davis v. Washington*, 547 U.S. 813, 821 (2006). Trial counsel was merely eliciting the same type of human lie detector testimony from the same witness on the same evidentiary point. This is not prohibited. *See Eggen*, 51 M.J. at 162 ("[T]he actions by the defense counsel opened the door for [the redirect] examination by the prosecutor. Any error was induced or 'invited' by the defense."). Otherwise, preventing the Government from walking through the door already opened by the defense would have left the members with a skewed view of the evidence. *See United States v. Banks*, 36 M.J. 150, 162 (C.M.A. 1992) (noting that evidence "may be admitted in rebuttal when a party 'opens the door' by introducing potentially misleading testimony") (citation omitted); *see also United States v. Segines*, 17 F.3d 847, 856 (6th Cir. 1994) (allowing evidence on the same issue "to rebut any false impression that might have resulted from the earlier admission") (citation omitted) (internal quotation marks omitted). Thus, the defense "open[ed] the door to prosecution rebuttal." *Schlamer*, 52 M.J. at 86. Appellant cannot now complain on appeal about the admission of the human lie detector evidence.[5]

## IV. Decision

We answer the certified issue in the affirmative and therefore do not reach the granted issue. Accordingly, the decision of the United States Navy-Marine Corps Court of Criminal Appeals is affirmed.

---

[5] Moreover, trial defense counsel never objected to the Government's elicitation of human lie detector testimony. Appellant certainly cannot show that the military judge's acquiescence to the introduction of this counterbalancing human lie detector testimony was plainly erroneous. *See Schlamer*, 52 M.J. at 86; *Eggen*, 51 M.J. at 162.

Judge STUCKY, with whom Chief Judge ERDMANN joins, dissenting.

At Sergeant (Sgt) Martin's trial, the scales of justice were tipped by grossly improper testimony from the victim's husband explaining why he believed that his wife was "telling the truth." Despite the fact that this impermissible evidence was first introduced by the Government on direct examination, the majority concludes that the defense invited the error on cross-examination. *United States v. Martin*, __ M.J. __, __ (6-7) (C.A.A.F. 2016). This conclusion fails to realistically assess the relevant testimony, and I therefore respectfully dissent.

## I. Invited Error

It is "the jury's exclusive function to weigh evidence and determine credibility." *United States v. Kasper*, 58 M.J. 314, 315 (C.A.A.F. 2003) (citation omitted) (internal quotation marks omitted). Thus "an opinion as to whether [a] person was truthful in making a specific statement regarding a fact at issue in the case," also known as human lie detector testimony, is always inadmissible. *United States v. Knapp*, 73 M.J. 33, 36 (C.A.A.F. 2014) (citation omitted) (internal quotation marks omitted). In direct contravention of this well-established rule, the Government introduced testimony from Corporal (Cpl) AI, the alleged victim's husband, explaining that he believed his wife's story.

The majority concludes that during cross-examination, the defense invited this obvious human lie detector testimony by prompting Cpl AI to discuss how his wife's account originally "didn't make too much sense." However, Cpl AI's cross-examination testimony merely emphasized and repeated the doubts about his wife's account that he originally expressed during the Government's direct examination. Before the defense ever broached the subject, the Government asked Cpl AI:

> Q. When you originally talked to NCIS you told NCIS that you thought it possibly could have been you who had touched your wife?
>
> A. Yes, sir.

Q. Why did you say that?

A. I'm the kind of person that if it's even remotely an option I think about it like that. I guess I'm, like, a by-the-numbers-type of person. So, I mean, my wife could have thought about, you know, maybe it could have been another night. But just the way she has been since then, then I know it wasn't me. She wouldn't be acting the way she does nowadays, like, if it would have been me. Even if it was something that she wasn't expecting from me she wouldn't be acting that way.

In this exchange, the Government intentionally brought up Cpl's AI's doubt regarding his wife's story.[1] The majority emphasizes that the main thrust of Cpl AI's testimony—about his "own [potential] conduct" and "how his wife's behavior had changed"—was admissible evidence which "did not provide a sufficient inference that he believed CI was being truthful." *Martin*, __ M.J. at __ (9). This conclusion fails to recognize that all of this testimony went to explain why Cpl AI believed his wife's story. The majority does not acknowledge that the introduction to this testimony was Cpl AI explaining his original doubts, followed by an extensive explanation for why he now concurred in his wife's account.

According to the majority:

Testimony is the functional equivalent of human lie detector testimony when it invades the unique province of the court members to determine the credibility of witnesses, and the substance of the testimony leads the members to infer that the witness believes [another witness] is truthful or deceitful with respect to an issue at trial.

*Id.* at __ (6) (citing *United States v. Mullins*, 69 M.J. 113, 116 (C.A.A.F. 2010); *United States v. Brooks*, 64 M.J. 325, 329 (C.A.A.F. 2007)). By that very test, Cpl AI's direct examination testimony was inadmissible. Although Cpl AI did not

---

[1] Being aware that Cpl AI had expressed these doubts to NCIS, the Government seemingly wanted to "pull the sting" by addressing and explaining away the issue before the defense could exploit it. The Government was then able to bolster CRI's assault narrative by asking Cpl AI to explain why his own original musings—that he himself had groped his wife—could not be true.

make an explicit statement concerning his wife's credibility during direct examination, by explaining that his initial concerns with the truthfulness of his wife's account had been alleviated, Cpl AI implied that his wife was, in fact, "truthful in making a specific statement regarding a fact at issue in the case." *Knapp*, 73 M.J. at 36 (citation omitted) (internal quotation marks omitted).

While trial counsel may have hoped that Cpl AI would limit himself to explaining his own views, Cpl AI contrasted his own initial understanding of events with his wife's: "So, I mean, my wife could have thought about, you know, maybe it could have been another night." By going on to explain in detail why he could not have been the one "who had touched [his] wife," Cpl AI was offering an implicit opinion that his wife's story was credible. The substance of this testimony invaded the court members' exclusive role in determining witness credibility, and effectively presented Cpl AI to the panel as a human lie detector on direct examination.

The majority attempts to dispense with this analysis by concluding that even if the members inferred from Cpl AI's direct testimony that he believed his wife, it is not dispositive of the invited error analysis. *Martin*, __ M.J. at __ (9 n.4). In reaching this conclusion, the majority explains, without support, "In any court-martial members might understandably assume that a husband who is testifying at trial on behalf of the prosecution believes his wife is telling the truth about an alleged sexual assault." *Id.* Such an assertion overstates the natural assumptions, if any, that accompany a husband's agreement to testify on behalf of the government, and fails to acknowledge that any "assumptions" a panel might make based on a husband's mere decision to testify for the prosecution should not alter the legal analysis. Regardless of the panel's preconceptions, when a witness mentions another person's statement regarding a fact at issue in the case, and implicitly opines upon the truthfulness of that statement, that testimony "invade[s] the province of the court members to determine the credibility of witnesses." *Mullins*, 69 M.J. at 116.

On cross-examination, the defense merely emphasized Cpl AI's previously expressed doubt over and over, asking

3

Cpl AI, "you initially thought that maybe she imagined it?" and "[y]ou thought maybe she dreamed it?," etc. In forcing Cpl AI to repeat and discuss his doubts, the defense simply followed where the Government had led.

The doctrine of invited error is intended to hold parties responsible for their own actions. *United States v. Raya*, 45 M.J. 251, 254 (C.A.A.F. 1996). If anything, it was the Government that first invited error in Sgt Martin's case, and then completed it with blatant human lie detector testimony on redirect.

## II. Prejudice

Once the question of invited error is resolved, the prejudicial impact of the ultimate error is obvious.[2] To show prejudice, Appellant must demonstrate that there is "a reasonable probability that the error affected the outcome of the trial." *United States v. Marcus*, 560 U.S. 258, 262 (2010). By every measure, and on every factor, the impact of this error was significant.

It is helpful to begin by quoting the offending portion of the record—a direct, detailed endorsement of the victim's testimony on redirect, by her husband of three years:

> Q. Now, you just told the defense counsel that you had your doubts?
>
> A. Yes, sir.
>
> Q. You do believe your wife though, correct?
>
> A. I do, sir.
>
> Q. And she's telling the truth?
>
> A. She is, sir.
>
> Q. And why do you think that?
>
> A. The way — the way that it's affected her, the way that she's changed, the way that it's affected our marriage — the way that it's negatively im-

---

[2] Because the defense never objected, we review for plain error. *Knapp*, 73 M.J. at 36 ("Appellant has the burden of establishing (1) error that is (2) clear or obvious and (3) results in material prejudice to his substantial rights."). As Cpl AI's human lie detector testimony was obvious error, we proceed directly to analyzing whether the error was harmless.

> pacted us just as a family — we have two kids, we have three dogs, and she's just depressed. And I understand that a mother is, obviously, is stressed out from all that, especially with me deploying again. But even on good days, she'll just snap sometimes. And just the way that it's affected her, something as big as it had on her wouldn't just have happened over a small situation, sir.

This is important testimony—erroneously admitted—on a central issue in the case.

In cases where the Government relies heavily upon the credibility of the victim, we have consistently found that opinion testimony validating that victim's testimony was prejudicial. *United States v. Birdsall*, 47 M.J. 404, 410 (C.A.A.F. 1998) ("testimony was focused directly on the key issue in this trial, *i.e.,* the [victims'] credibility"); *United States v. Petersen*, 24 M.J. 283, 284 (C.M.A. 1987) (in a case with inconclusive physical evidence of sexual abuse, witness testified that she found the victim's version of events "[g]reatly" believable).

Just as in *Birdsall* and *Petersen*, CRI's account was the foundation of the Government's case, which was anything but strong. The only other eyewitness, Mr. West, provided a markedly different description than the one conveyed by CRI, claiming that Sgt Martin climbed into the bed and removed his shirt, while CRI said that he knelt beside the bed and remained fully clothed. Several of Mr. West's co-workers testified that he was not a truthful person. The defense also challenged CRI's credibility on multiple grounds: her account conflicted with Mr. West's, a coworker testified that she was not trustworthy, and she was attempting to relate an event that allegedly occurred as she awoke from an intoxicated sleep.

Moreover, the military judge sat passively while all of this transpired. She did nothing to inform the panel that they were not allowed to consider Cpl AI's opinion when deciding whether to believe his wife. Without such an instruction, the members would almost have to be superhuman to disregard such obviously relevant testimony, especially since the defense argued during closing argument that "her own husband is not convinced," and the Government responded

by hammering home that "he came back and he told you, verbatim, that he believed his wife."

As Sgt Martin's fate hung on the testimony of an intoxicated victim and a witness with a track record of untruthfulness, Cpl AI's stamp of approval became, of necessity, a cornerstone of the Government's case. His detailed, emotional testimony explained how his home life convinced him that CRI was telling the truth. This testimony could not but affect the panel's evaluation of CRI's credibility, and thus the Government's case. Appellant has demonstrated "a reasonable probability that the error affected the outcome of the trial." *Marcus*, 560 U.S. at 262.

The majority allows Sgt Martin's conviction to stand, despite this obvious and prejudicial error. I respectfully dissent.