# United States Navy-Marine Corps Court of Criminal Appeals

---

**UNITED STATES**
*Appellee*

v.

**James D. INCHAURREGUI**
**Fireman (E-3), U.S. Navy**
*Appellant*

---

**No. 201700194**

---

Appeal from the United States Navy-Marine Corps Trial Judiciary.

*Military Judge:* Commander Heather Partridge, JAGC, USN.

*Sentence Adjudged:* 1 March 2017 by a General Court-Martial convened at Region Legal Service Office, Norfolk, Virginia, consisting of officer and enlisted members.

*Approved Sentence:*
Dishonorable discharge, confinement for 10 years, forfeiture of $2,125.00 pay per month for six months, and reduction to E-1.

---

*Decided:* 2 January 2019

---

*For Appellant:* Mr. Eric S. Montalvo, Esq.;
Ms. Carol Thompson, Esq.;
Lieutenant Daniel E. Rosinski, JAGC, USN.

*For Appellee:* Lieutenant George R. Lewis, JAGC, USN;
Captain Brian L. Farrell, USMC.

_____

**This opinion does not serve as binding precedent,
but may be cited as persuasive authority under
NMCCA Rule of Practice and Procedure 30.2**

_____

*Before WOODARD, CRISFIELD, and HITESMAN,
Appellate Military Judges.*

WOODARD, Chief Judge:

A panel of members with enlisted representation sitting as a general court-martial convicted the appellant, contrary to his pleas, of six specifications of sexual assault in violation of Article 120(b), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920 (2012). The appellant was also convicted, pursuant to his plea, of one specification of wrongful use of a Schedule I controlled substance in violation of Article 112a, UCMJ; 10 U.S.C. § 912a (2012). The members sentenced the appellant to 10 years' confinement, reduction to pay grade E-1, forfeiture of $2,125.00 pay per month for six months, and a dishonorable discharge. In an act of clemency, the convening authority (CA) modified the sentence by deferring and waiving the forfeiture of pay for the maximum allowed period under Articles 57(a) and 58b, UCMJ. He then approved the modified sentence and, with the exception of the dishonorable discharge, ordered it executed.

The appellant has raised the following assignments of error (AOEs):[1] (1) the military judge erred by admitting testimony on the topic of tonic immobility from an unqualified expert; (2) the military judge erred by admitting hearsay testimony; (3) the appellant was found guilty of and sentenced on unreasonably multiplied charges; (4) the trial defense counsel provided ineffective assistance; (5) the sentence was disparate and inappropriately severe; and (6) cumulative error necessitates relief.

After careful consideration of the record of trial and the pleadings of the parties, we conclude that the findings and the sentence are correct in law and fact and find no error materially prejudicial to the substantial rights of the appellant. Arts. 59(a) and 66(c), UCMJ.

---

[1] We have reordered the AOEs in order to more clearly address the raised errors and applicable law.

## I. BACKGROUND

The appellant and female Fireman (FN) CR were both Sailors stationed at the same base, but assigned to different ships. Although they had never met one another before the night of the offense, they had two mutual friends, male Boatswain's Mate Third Class (BM3) J and female Logistics Specialist Seaman (LSSN) W. These mutual friends held an impromptu gathering in their shared apartment, and the appellant and FN CR attended. In addition to the appellant, FN CR, BM3 J, and LSSN W, there were several other people in and out of the house that evening. Although the appellant would later tell Naval Criminal Investigative Service (NCIS) Special Agent M, that he and FN CR had flirted throughout the evening, by all other accounts, there was little to no personal interaction—no flirting, no touching—between the appellant and FN CR during the gathering.

Throughout the evening and into the early morning hours, FN CR consumed a substantial amount of alcohol and became intoxicated. The appellant, however, consumed no alcohol. Feeling ill, FN CR left the group around 0130 while they were still socializing in the living room. FN CR went to LSSN W's bedroom to recover. After becoming sick and vomiting, FN CR decided to go to sleep. Clothed in sweatpants, shoes, shirt, and a jacket, FN CR laid down on a mattress on the floor, put on her headphones, turned on some meditation music, and went to sleep.

Sometime just before 0300, LSSN W and BM3 J decided that they wanted breakfast from a local restaurant. Before leaving to go to the restaurant, they went into the room where FN CR was sleeping to invite her to accompany them. When LSSN W shook FN CR to wake her, FN CR mumbled but would not get up. LSSN W and BM3 J left the room, closing the door behind them. On their way out, they also invited the appellant, who was still in the living room, but he declined the offer. At the time LSSN W and BM3 J left to go to the restaurant, FN CR was in LSSN W's room asleep, a third roommate was in his bedroom, another male friend was sleeping on the couch, and the appellant was awake in the living room.

After LSSN W and BM3 J left to get breakfast, the appellant entered the room where FN CR was sleeping. As he would later tell Special Agent M, he found FN CR attractive, thought they had a connection, and went into the room hoping she would have sex with him. Acting on this hope, the appellant laid down on the mattress next to FN CR. The appellant told Special Agent M that while lying on his side next to her, FN CR moved her bottom towards him, grabbed his arm, and placed his hand between her legs near her vaginal area. The appellant then described how, without further response from FN CR, he began rubbing her vagina through her clothes, and tried to pull her pants and underwear down. Unable to get FN CR's pants and underwear down, he rolled

her over onto her stomach, pulled her sweatpants and underwear down to thigh-level, got on top of her, and digitally penetrated her vagina. The appellant also described to Special Agent M how he spat on his hand, and masturbated while digitally penetrating FN CR. Although he denied penetrating FN CR's vulva with his penis, he admitted that he did make skin-to-skin contact between his penis and her vagina. The appellant told Special Agent M that FN CR did not respond to his actions in any manner—no movement, no sound. Finding FN CR's lack of any response strange, the appellant told Special Agent M that he stopped trying to have sex with FN CR, pulled her pants and underwear back into place, kissed her on the cheek, rolled over onto the floor, and went to sleep.

FN CR testified that, although she was asleep or passed out when the appellant entered the room, she was awakened by the pain caused by the appellant penetrating her with his fingers and penis. She described that, although she tried, she could neither move nor speak to stop the appellant. She was scared and confused. She described feeling the appellant's small frame laying on top of her, his finger nails scratching the interior of her vagina, and his stomach hitting her as he pushed his penis in and out of her vagina. She also heard the appellant's heavy breathing and spitting, felt the spit hit her bottom, and could tell that he was, at times, masturbating. FN CR testified that she did not remember the assault ending, that "[t]here was a point that [she] could not even take the pain anymore" and she "passed out."[2] The next memory FN CR had was of awakening sometime around 0900 the next morning.

When LSSN W and BM3 J returned from breakfast around 0500, they found the appellant asleep on the floor lying next to the mattress where FN CR was sleeping. LSSN W told the appellant to get out of the room, and BM3 J told him to go sleep in his bedroom. Nothing about FN CR's appearance alerted LSSN W or BM3 J as to what had happened when they were at breakfast. After the appellant and BM3 J left the room, LSSN W laid down on the floor next to the mattress and went to sleep.

At 0900 when FN CR awakened, she saw LSSN W sleeping on the floor next to her. Thinking she had dreamt she was assaulted, FN CR went to the restroom to relieve herself. While in the bathroom, FN CR discovered that she was extremely sore, "there was a lot of a sticky substance down there" and "[t]here was white stuff in [her] underwear."[3]

---

[2] Record at 319.

[3] Record at 321.

Upon leaving the bathroom, FN CR found the appellant in BM3 J's room, woke him, and asked him if "he was the one that violated [her] in [her] sleep."[4] When the appellant admitted that he did and apologized, FN CR asked him if he had worn a condom—to which the appellant responded by shaking his head in a negative response. FN CR then went to awaken LSSN W and ask her for a ride back to base, and then went outside to smoke a cigarette. On the drive back to the base, FN CR told LSSN W that the appellant had "raped her."[5] LSSN W convinced FN CR to call a sexual assault prevention and response (SAPR) representative and report the assault.

The SAPR representative met them and FN CR was taken to the base medical facility where she consented to a sexual assault forensic examination. The semen and DNA evidence obtained during the examination was later identified as the appellant's.

Several months after the assault, NCIS arranged for BM3 J to have a conversation with the appellant. During the conversation, BM3 J wore a recording device that captured their conversation. In the conversation, the appellant admitted to BM3 J that he had tried to have sex with FN CR. He explained that after entering the room when FN CR was asleep and laying down next to her, FN CR moved her bottom towards him and placed his hand on her vaginal area. He rolled her over, pulled her pants down, but then decided not to have sex with her. Over the next several months, the appellant provided a similar, although more detailed, version of what happened between him and FN CR to Special Agent M.

At trial, the appellant was charged with six specifications of violating Article 120(b), UCMJ, for the two sexual acts. Three specifications alleged that he sexually assaulted FN CR by penetrating her vulva with his penis, and three alleged he penetrated her vulva with his finger. For each sexual act, the three specifications alleged a separate theory of liability. One alleged the sexual act was committed by doing bodily harm to FN CR without her consent—charged as a violation of Article 120(b)(1)(B), UCMJ; one alleged the sexual act was committed when the appellant knew or reasonably should have known that FN CR was unable to give consent because she was asleep, unconscious, or otherwise unaware—charged as a violation of Article 120(b)(2); and one alleged the sexual act was committed when the appellant knew or reasonably should have known that FN CR was incapable of giving consent due to her impairment by alcohol—charged as a violation of Article 120(b)(3)(A), UCMJ.

---

[4] Record at 323.

[5] Record at 287.

Before contesting the sexual assault allegations against him, the appellant pleaded guilty to an unrelated charge of wrongfully using a Schedule I controlled substance on divers occasions. At trial, the defense theory was that FN CR consented to the sexual acts, or alternatively, the appellant reasonably believed that she had consented. Additional facts necessary to the resolution of the issues will be discussed below.

## II. DISCUSSION

### A. Admission of Tonic Immobility Testimony

The appellant avers that the military judge abused her discretion by allowing opinion testimony from a sexual assault forensic examination and nursing expert on a topic—tonic immobility—the appellant claims was outside of the expert's scope of expertise. We disagree.

MILITARY RULE OF EVIDENCE (MIL. R. EVID.) 702, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2016 ed.), allows a witness to testify as an expert on a particular subject matter if the witness is qualified to do so based on his or her knowledge, skill, experience, training, or education regarding that subject. The testimony provided by the expert must: (1) be helpful to the trier of fact in understanding the evidence or in determining a fact in issue; (2) be based on sufficient facts or data; (3) be the product of reliable principles and methods; and (4) reliably apply those principles and methods to the facts of the case. MIL. R. EVID. 702. If the expert testifies in the form of an opinion, that opinion may be based "on facts or data in the case that the expert has been made aware of or personally observed." MIL. R. EVID. 703.

The proponent of expert testimony must establish: (1) the qualifications of the expert; (2) the subject matter of the expert testimony; (3) the basis for the expert testimony; (4) the relevance of the testimony; (5) the reliability of the testimony; and (6) the probative value of the testimony. *United States v. Houser*, 36 M.J. 392, 397 (C.M.A. 1993). "As gatekeeper, the trial court judge is tasked with ensuring that an expert's testimony both rests on a reliable foundation and is relevant." *United States v. Sanchez*, 65 M.J. 145, 149 (C.A.A.F. 2007).

It is not necessary to satisfy every *Houser* factor as "the inquiry is 'a flexible one,'" and "the factors do not constitute a 'definitive checklist or test.'" *Sanchez*, 65 M.J. at 149 (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593-94 (1993)). A military judge is not "required to conduct a formal *Daubert* hearing or to precisely address each of the factors spelled out in *Houser* when deciding whether and how a proffered expert should testify. *United States v. Flesher,* 73 M.J. 303, 312 (C.A.A.F. 2014) (citing *Sanchez,* 65 M.J. at 149). The military judge is obligated to take an active "gatekeeper" approach

only when the proffered evidence is "called sufficiently into question." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 145 and 149 (1999).

We review *de novo* "whether the military judge properly performed the required gatekeeping function of [MIL. R. EVID.] 702." *Flesher,* 73 M.J. at 311 (citing *United States v. Griffin,* 50 M.J. 278, 284 (C.A.A.F. 1999)). And we review a military judge's decision to admit the testimony of an expert under the abuse of discretion standard. *Flesher,* 73 M.J. at 311. This court "will reverse for an abuse of discretion if the military judge's findings of fact are clearly erroneous or if his decision is influenced by an erroneous view of the law." *United States v. Sullivan,* 42 M.J. 360, 363 (C.A.A.F. 1995) (citation omitted). We will not set aside a trial judge's decision to admit evidence unless we come to a "definite and firm conviction that the [trial judge] committed a clear error of judgment." *Houser,* 36 M.J. at 397 (citations omitted).

At trial, LT Z, the nurse who conducted FN CR's sexual assault forensic examination, was recognized without objection as an expert in the field of nursing and sexual assault forensic examinations. LT Z testified that as part her examination of FN CR, she received a narrative from FN CR describing the sexual assault. A portion of that narrative consisted of FN CR describing how she reacted and felt at the time of the assault. LT Z testified that FN CR described feeling as though she could not move, speak, or "do anything."[6] This portion of LT Z's testimony was not objected to at trial.

However, LT Z went on to explain the temporary state of motor inhibition in response to traumatic events or situations involving extreme fear known as "tonic immobility" and then opined that FN CR's inability to move or speak during the assault was consistent with a person who was experiencing tonic immobility.[7] It is the tonic immobility portion of LT Z's testimony that the appellant objected to at trial as beyond scope of LT Z's training, knowledge, and experience as an expert witness in nursing or sexual assault forensic examination and which he now asserts is error.

Here, the military judge did not conduct a formal *Houser* inquiry, or mention *Houser* or MIL. R. EVID. 702 or 703 in her ruling. However, in overruling the appellant's objection and admitting LT Z's tonic immobility testimony, the military judge did send "a clear signal that [she] applied the right law"—

---

[6] Record at 401.

[7] As explained by both LZ and the defense's sexual assault forensic examination expert, tonic immobility arises when a person is experiencing a traumatic event and in order to protect itself from the event, the body shuts down—the person cannot move or speak. Record at 426.

*Houser* and MIL. R. EVID. 702 and 703. *Flesher,* 73 M.J. at 311-12. She did so by stating that she had considered the area of expertise for which LT Z had been offered as an expert, the subject matter on which LT Z was testifying, and that she had "conduct[ed] an ongoing [MIL. R. EVID.] 403 analysis.[8] Accordingly, we find that the military judge was exercising her gatekeeping function. The question we must now determine is whether she properly applied the law.

Our inquiry is a flexible one. After a thorough review of the record and examining it with the requirements of MIL. R. EVID. 702 and 703 and the *Houser* factors in mind, we conclude that the military judge properly applied the law and did not abuse her discretion.

The military judge received testimony that tonic immobility is a subject on which sexual assault forensic examiners are formally trained and educated, to include recognizing tonic immobility's causes and symptoms. The military judge had also been presented with evidence that LT Z was an educated, qualified, and experienced nurse and sexual assault forensic examiner. In addition to her Department of Defense certification as a sexual assault forensic examiner, LT Z had also completed other sexual assault forensic examiner certifications. At the time of this court-martial LT Z had participated in more than 65 sexual assault forensic examinations. The record also establishes that, through her training, certification, and experience as a nurse and sexual assault forensic examiner, LT Z had the knowledge, skill, experience, training, and education to testify as an expert on the subject of tonic immobility—but only to its causes and symptoms.

Further, although the military judge did not place any limitations on the testimony concerning tonic immobility, LT Z did not exceed her expertise in the subject by *diagnosing* FN CR as having suffered from tonic immobility— something we recognize she would not have been qualified to do. Indeed, LT Z did not opine that FN CR suffered from tonic immobility, only that FN CR exhibited symptoms consistent with tonic immobility.

The testimony was relevant as it could be helpful to the members in understanding the evidence before them or in determining a fact in issue. Specifically, whether FN CR had experienced a traumatic, frightening event—the sexual assault. LT Z's testimony was based on and limited to her specialized training, knowledge, education, experience, and observations in this case.

Finally, we find no evidence in the record that the probative value of the testimony was outweighed by other considerations. Accordingly, we concluded

---

[8] Record at 426.

the military judge did not abuse her discretion in admitting LT Z's tonic immobility testimony.

**B. Admission of Excited Utterance**

The appellant next contends that the military judge erred by admitting, over defense objection, inadmissible hearsay under the excited utterance exception to the hearsay rule. He contends that FN CR's statement to LSSN W that the appellant had raped her was not an excited utterance. We disagree.

We review the military judge's decision to admit statements "under the excited utterance exception to the rule against hearsay" for an abuse of discretion. *United States v. Feltham*, 58 M.J. 470, 474 (C.A.A.F. 2003) (citing *United States v. Moolick,* 53 M.J. 174 (C.A.A.F. 2000)). The abuse of discretion standard requires "more than a mere difference of opinion"—the decision must be "arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *United States v. Collier*, 67 M.J. 347, 353 (C.A.A.F. 2009) (citations and internal quotation marks omitted).

"A statement relating to a startling event or condition made while the declarant was under the stress of excitement that it caused," is admissible as an exception to the general prohibition on hearsay. MIL. R. EVID. 803(2). "The implicit premise [of the exception] is that a person who reacts 'to a startling event or condition' while 'under the stress of excitement caused' thereby will speak truthfully because of a lack of opportunity to fabricate." *United States v. Jones,* 30 M.J. 127, 129 (C.M.A. 1990).

Our superior court has adopted a three-part test to determine whether a hearsay statement qualifies as an excited utterance: "(1) the statement relates to a startling event, (2) the declarant makes the statement while under the stress of excitement caused by the starting event, and (3) the statement is spontaneous, excited or impulsive rather than the product of reflection and deliberation." *United States v. Donaldson,* 58 M.J. 477, 482 (C.A.A.F. 2003) (internal quotations and citations omitted).

The appellant does not assert that a sexual assault would not constitute a startling event. Nor does he dispute that FN CR's statement made to LSSN W that she was raped by the appellant related to the sexual assault. Instead, the appellant argues that the statement was not made by FN CR while she was under the stress or excitement of a startling event. The appellant places particular emphasis on the time lag between the sexual assault and the intervening conversations FN CR had before making the statement to LSSN W. He asserts that because FN CR had time to "mull the events over in her head . . .

such a lapse in time can hardly be considered spontaneous, impulsive, or to have immediately followed the exciting incident."[9] We disagree.

"A lapse of time between a startling event and an utterance, while a factor in determining whether the declarant was under the stress of excitement caused by the event, is not dispositive of that issue." *Donaldson,* 58 M.J. at 483 (citations omitted). Although "a lapse of time between the event and the utterance creates a strong presumption against admissibility," *Jones,* 30 M.J. at 128, "the lapse of any particular period of time, is not the focus of the excited utterance rule. The critical determination is whether the declarant was under the stress or excitement caused by the startling event." *Feltham,* 58 M.J. at 475 (citation omitted).

FN CR testified that she awoke in the middle of the night to the appellant sexually assaulting her. She described the assault as being so painful she passed out. When she awoke later that morning with LSSN W laying on the floor next to her, she was confused and thought she may have dreamed that she was assaulted. When she went to the restroom she discovered a sticky white substance "down there[, and] . . . felt a lot of like little cuts."[10] Still not wanting to believe that she had been sexually assaulted, she sought out and confronted the appellant, who confirmed that he had "violated [her] in [her] sleep" and apologized to her.[11] Now knowing that she had been sexually assaulted, she woke up LSSN W, went outside and, although not a smoker, smoked a cigarette, spoke briefly to someone, and then left with LSSN W to go back to the base. During the ride, LSSN W described FN CR as still being visibly upset and unable to "put . . . into words" what had happened to her.[12] We are convinced that based upon the foregoing there was sufficient evidence for the military judge to conclude that FN CR was still under the stress of excitement caused by the sexual assault, and that her statement to LSSN W—that the appellant sexually assaulted her—was not the result of reflection or fabrication. Accordingly, we find that the military judge did not abuse her discretion in admitting FN CR's statement to LSSN W as an excited utterance. The military judge applied the proper legal test to evaluate the statement, and, after hearing and evaluating the evidence, determined that the facts satisfied the test.

---

[9] Appellant's Brief at 59.

[10] Record at 321.

[11] Record at 323.

[12] Record at 287.

**C. Unreasonable Multiplication of Charges**

The appellant contends that the military judge abused her discretion by not merging all of the sexual assault specifications for sentencing, arguing that the digital penetration and the penile penetration of FN CR's vulva was but one act because both acts were part of the same transaction. We disagree.

*1. Additional background*

In Charge II, the government charged the appellant with two sexual acts as violations of Article 120(b), UCMJ, under three separate theories of liability, and in six specifications. The sexual acts charged were the penetration of FN CR's vulva with the appellant's finger (Specifications 1, 3, and 5) and the penetration of FN CR's vulva with his penis (Specifications 2, 4, and 6). The three theories of liability were: the sexual acts were committed by bodily harm and without the consent of FN CR (Specification 1—digital penetration, and Specification 2—penile penetration); the sexual acts were committed when the appellant knew or reasonably should have known that FN CR was asleep, unconscious, or otherwise unaware (Specification 3—digital penetration, and Specification 4—penile penetration); and the sexual acts were committed when the appellant knew or reasonably should have known that FN CR was incapable of giving consent due to impairment by alcohol (Specification 5—digital penetration, and Specification 6—penile penetration).

Prior to trial the appellant objected to Charge II on multiplicity and unreasonable multiplication of charges grounds. The military judge denied the appellant's motion, finding that the specifications alleged separate sexual acts. However, she noted that the specifications alleged multiple theories of liability for the same sexual acts, and forewarned the parties that she would reconsider the unreasonable multiplication of charges motion for sentencing, if necessary.

Based upon the results of the members' findings and relying on *United States v. Thomas,* 74 M.J. 563 (N-M. Ct. Crim. App. 2014), the military judge informed the parties that she was inclined to consolidate the operative language of Specification 4 into Specification 2,[13] and conditionally dismiss Spec-

---

[13] After combining the operative language from Charge II, Specification 4 into Specification 2 of that charge, the new Specification 2 read as follows: "In that Fireman James D. Inchaurregui, . . . did . . . commit a sexual act upon [FN CR], . . . to wit: penetration of her vulva with his penis, when he knew or reasonably should have known that [FN CR] was asleep, unconscious, or otherwise unaware that the sexual act was occurring and by causing bodily harm to her, to wit: commission of the sexual act without her consent." AE XIII at 2.

ifications 3, 5, and 6. The appellant again objected on the grounds of multiplicity arguing that he had been "found guilty of the same offense two different times" and was now being sentenced for that same offense twice—essentially arguing again that the penile and digital penetration was a single transaction and therefore should be considered as a continuing course of conduct and not as two distinct or discrete acts.[14] The military judge again denied the appellant's motion, finding that the digital and penile penetration were distinct sexual acts, punishable as separate offenses.

### 2. Applicable law

"What is substantially one transaction should not be made the basis for an unreasonable multiplication of charges against one person." R.C.M. 307(c)(4). An accused may seek relief from charges he or she believed to be unreasonably multiplied from the military judge. *See* R.C.M. 906(b)(12). "The relief may include the dismissal of lesser offenses, merger of offenses into one specification, or a determination that the maximum punishment for the unreasonably multiplied offenses is the maximum authorized punishment of the offense carrying the greatest maximum penalty." *United States v. Hardy,* 77 M.J. 438, 440 (C.A.A.F. 2018) (citations omitted).

Multiplicity is a concept distinct from unreasonable multiplication of charges. *United States v. Paxton,* 64 M.J. 484, 490 (C.A.A.F. 2007) (citations omitted). "Multiplicity, a constitutional violation under the Double Jeopardy Clause, occurs if a court, 'contrary to the intent of Congress, imposes multiple convictions and punishments under different statutes for the same act or course of conduct.'" *Id.* (quoting *United States v. Teters,* 37 M.J. 370, 373 (C.M.A. 1993). However, if it is the intent of Congress for each distinct or discrete act to be criminalized, then multiple convictions and punishment for each distinct or discrete act under the same statute is allowed. *United States v. Neblock*, 45 M.J. 191, 197 (C.A.A.F. 1996).

Unreasonable multiplication of charges, a non-constitutional violation, "addresses those features of military law that increase the potential for overreaching in the exercise of prosecutorial discretion." *United States v. Quiroz,* 55 M.J. 334, 337 (C.A.A.F. 2001). Charges may constitute unreasonable multiplication either as applied to findings or as applied to sentencing. *United States v. Campbell,* 71 M.J. 19, 23 (C.A.A.F. 2012). We consider five non-exclusive factors to determine whether there is an unreasonable multiplication of charges: (1) whether the appellant objected at trial; (2) whether each charge and specification is aimed at distinctly separate criminal acts; (3) whether the number of charges and specifications misrepresents or exaggerates the appellant's

---

[14] Record at 560-61.

criminality; (4) whether the number of charges and specifications unreasonably increases the appellant's punitive exposure; and, (5) whether there is any evidence of prosecutorial overreaching or abuse in the drafting of the charges. *See Quiroz,* 55 M.J. at 338-39.

Under *Quiroz,* no one factor is dispositive. Instead, these factors are weighed together, and "one or more . . . may be sufficiently compelling." *Campbell,* 71 M.J. at 23. While some factors may be more pertinent when assessing unreasonable multiplication of charges as to findings, others pertain more to sentencing. The nature of the harm directly affects the remedy a military judge will craft should an unreasonable multiplication be found. In cases in which there is an unreasonable multiplication of charges as to findings, the military judge should ordinarily resolve the harm through consolidation of the specifications. This is accomplished by "combining the operative language from each specification into a single specification that adequately reflects each conviction." *Thomas,* 74 M.J. at 568-69 (footnote omitted). In cases in which there is an unreasonable multiplication of charges as to sentencing, the military judge should ordinarily resolve the harm through merging the specifications for sentencing. In this situation, each affected specification remains, but the maximum punishment available is reduced to that of the greatest offense merged. In other words, the accused should be punished as if the affected specifications or charges were but a single offense. *Id.*

*3. Analysis*

The first issue we must determine is whether or not the appellant's digital and penile penetration of FN CR's vulva amount to the "same act or course of conduct" or whether they are discrete acts, allowing separate convictions. *Teters,* 37 M.J. at 373. We find them to be discrete acts, thus permitting separate convictions.

Congress's intent that Article 120(b), UCMJ, be applied as a discrete-act offense and not as a course-of-conduct offense is made clear by how it defined *sexual act.* Under the statute, *sexual act* is defined as:

> (A) contact between the penis and the vulva . . . , and for purposes of this subparagraph contact involving the penis occurs upon penetration, however slight; or

> (B) the penetration, however slight, of the vulva . . . of another by any part of the body or by any object, with the intent to abuse, humiliate, harass, or degrade any person or to arouse or gratify the sexual desire of any person.

Art. 120(g)(1), UCMJ. By providing two definitions for *sexual act*—one involving penetration exclusively by the penis and another that includes penetration by a finger—as well as the addition of a specific intent *mens rea* that must be

proven when the penetration is accomplished by a finger, we conclude Congress intended Article 120(b), UCMJ, to be a discrete-act offense, thus permitting separate convictions for penetration of a victim's vulva accomplished by digital and penile penetration, regardless of the timing of those penetrations.

Having determined that the appellant's penetration of FN CR's vulva with his finger and penis are discrete acts and could therefore sustain separate convictions, we now examine whether the findings as consolidated by the military judge still represents an unreasonable multiplication of charges for sentencing by applying the *Quiroz* five-part test. We find that they do not.

The first *Quiroz* factor weighs in the appellant's favor. He objected on the grounds of both multiplicity and unreasonable multiplication of charges prior to findings.

The remaining *Quiroz* factors all favor the government. The manner in which the military judge consolidated and conditionally dismissed the findings resulted in the appellant facing two specification of sexual assault, each aimed at distinctly separate criminal acts. As the sexual assault specifications for which the appellant was sentenced reflect distinct acts of criminal conduct, there was no exaggeration of his criminality. Although merging the discrete acts into a single specification would have decreased the appellant's punitive exposure by almost half, not doing so was not unreasonable. The appellant committed two discrete criminal acts, both punishable by 30 years' confinement. That he is subject to the full measure of punishment authorized for his criminal acts is not unreasonable.

Finally, we find no evidence in the record of prosecutorial overreaching or abuse in the drafting of the charges. As indicated in the record, the government charged the appellant with the two discrete criminal acts, and, for exigencies of proof, charged each act under three separate theories of liability. Charging a single criminal act in separate specifications alleging separate theories of liability is an appropriate charging strategy, particularly in cases alleging violations of Article 120, UCMJ, given the nuances and complexity of such cases. *United States v. Elespuru,* 73 M.J. 326, 329-30 (C.A.A.F. 2014). However, if members return findings of guilty for multiple specifications for the same act and the specifications were charged for exigencies of proof, the military judge must either to consolidate or dismiss specifications—as the military judge did here. *Id.* (citations omitted).

Accordingly, we find the military judge did not abuse her discretion by declining to merge the specifications for sentencing.

## D. Ineffective Assistance of Counsel

The appellant complains that his trial defense counsel were ineffective throughout both the pretrial and trial stages of representation. He asserts that

his trial defense team were ineffective before trial by failing to conduct an adequate pretrial investigation in that they did not: (1) read the results of FN CR's sexual assault forensic examination report prepared by the government's sexual assault forensic examiner, LT Z, or interview her; and (2) consult with their forensic toxicologist, Dr. W, concerning FN CR's ability to actively participate in sexual intercourse without later recalling her actions due to her level of intoxication. The appellant also asserts that his trial defense counsel were ineffective at trial by: (1) failing to introduce relevant and material testimony from Dr. W and their sexual assault forensic examiner, Nurse B; (2) eliciting human lie-detector testimony from Special Agent M; and (3) waiving objection to statements made by the appellant.

We review claims of ineffective assistance of counsel *de novo. United States v. Harpole,* 77 M.J. 231, 236 (C.A.A.F. 2018). The Sixth Amendment entitles criminal defendants to representation that does not fall "below an objective standard of reasonableness" in light of "prevailing professional norms." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). In order to prevail on a claim of ineffective assistance of counsel, an appellant must demonstrate both (1) that his counsel's performance was deficient, and (2) that this deficiency resulted in prejudice. *Id.* at 687. The *Strickland* test for ineffective assistance of counsel applies to all phases of the court-martial—to include the pretrial phase. *See United States v. Lincoln,* 40 M.J. 679, 690 (N-M. Ct. Crim. App. 1994), *rev'd, in part, on other grounds,* 42 M.J. 315 (C.A.A.F. 1995); *United States v. King,* 27 M.J. 664, 669 (A. Ct. Crim. App. 1988).

With respect to *Strickland's* first prong, we presume counsel to be competent and our inquiry into an attorney's representation is "highly deferential." *Strickland,* 466 U.S. at 689. We employ "a strong presumption that counsel's conduct falls within the wide range of professionally competent assistance." *Id.* The appellant has the heavy burden of establishing a factual foundation for a claim of ineffective representation. *United States v. Grigoruk*, 52 M.J. 312, 315 (C.A.A.F. 2000). We will not second-guess strategic or tactical decisions made by the trial defense counsel unless the appellant can show specific defects in counsel's performance that were unreasonable under prevailing professional norms. *United States v. Mazza,* 67 M.J. 470, 475 (C.A.A.F. 2009). "We do not look at the success of a criminal defense attorney's trial theory, but rather whether counsel made an objectively reasonable choice in strategy from the alternatives available at the time." *United States v. Dewrell,* 55 M.J. 131, 136 (C.A.A.F. 2001) (citations omitted).

We need not, however, "determine whether counsel's performance was deficient before examining the prejudice suffered by the [appellant] as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffective claim on the ground of lack of sufficient prejudice, which we expect will often be so, that

course should be followed." *Strickland*, 466 U.S. at 697. In order to show prejudice under *Strickland's* second prong, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696.

*1. Failure to read the results of the sexual assault forensic examination and interview LT Z*

The appellant claims that his trial defense counsel did not read the results of FN CR's sexual assault forensic exam prepared by LT Z. Nor did they interview LT Z. The appellant asserts that because his trial defense counsel did not read the report or interview LT Z, they were unaware that LT Z had noted and would likely testify, as she did at trial, that FN CR exhibited symptoms consistent with tonic immobility. The appellant argues that if his trial defense counsel had been aware of the tonic immobility issue before trial they could have filed a motion to suppress the tonic immobility preventing its introduction by arguing LT Z was not qualified under *Houser* to "testify on the topic."[15] We disagree.

Even if we were to assume that the appellant's trial defense counsel did not read LT Z's report or interview her prior to trial and those failures resulted in LT Z testifying at trial about tonic immobility, if these failures did not prejudice the appellant, no relief is warranted. In order to show prejudice here, the appellant would have to show that there is a reasonable probability that any motion to prevent LT Z from testifying about tonic immobility "would have been meritorious." *United States v. Jameson,* 65 M.J. 160, 163-64 (C.A.A.F. 2007) (quoting *United States v. McConnell,* 55 M.J. 479, 482 (C.A.A.F. 2001) (motion to suppress evidence). In this regard, the term "meritorious" is synonymous with "successful." *Jameson,* 65 M.J. at 164.

Having previously determined that the tonic immobility testimony LT Z provided at trial was properly admitted and not outside of her scope of expertise, we conclude that there is no reasonable probability that a motion to prevent LT Z from testifying as she did at trial would have been successful. Accordingly, the appellant has failed to meet his burden under *Strickland's* second prong.

---

[15] Appellant's Brief of 4 Dec 2017 at 49.

*2. Failure to consult with Dr. W and present his testimony at trial*

Dr. W avers via affidavit before this court that, despite his presence at the court-martial, the appellant's trial defense counsel did not consult with him regarding FN CR's level of intoxication at the time of the sexual assault. He alleges that had they done so and called him as a witness he could have provided expert testimony that based on the amount of alcohol FN CR had consumed she could have been in a "blackout" state at the time the sexual assault occurred. Thus, it would have been possible for FN CR to have "actively participate[d] in sexual intercourse without later recalling all of her actions."[16] The appellant claims that if the members had had the benefit of Dr. W's testimony, there is a reasonable probability that the members would have had a reasonable doubt as to his guilt. We disagree.

Under the guiding principles of *United States v. Ginn,* 47 M.J. 236, (C.A.A.F. 1997), "if the facts alleged in the affidavit allege an error that would not result in relief even if any factual dispute were resolved in appellant's favor, the claim may be rejected on that basis." *Id.* at 248. We do so here. Even if the facts alleged by Dr. W are true, we are confident that the absence of Dr. W's testimony did not prejudice the appellant.

Here, even in the absence of Dr. W's testimony, the members were already acutely aware of FN CR's extreme intoxication. So much so, they found that she was incapable of giving consent due to her level of intoxication.

Further, even if Dr. W had testified that based on her level of intoxication FN CR could have suffered from an alcohol induced blackout and not later recall actively participating in sexual intercourse, the record is devoid of any evidence that FN CR actively participated in any sexual act. The only evidence before the members of any action by FN CR immediately before or during the sexual acts was the appellant's claim that she moved her bottom towards him and placed his hand on her vaginal area—actions that, if the members believed them to have occurred, occurred prior to any sexual act. As the appellant repeatedly explained to Special Agent M, FN CR took no active role in any sexual act—no words, no sounds, no movement. Statements that were corroborated by FN CR's testimony that she could not move or speak during the assault.

Accordingly, even if Dr. W had testified and the appellant's trial defense counsel had argued that FN CR couldn't remember actively participating in the sexual acts because she suffered from an alcohol induced blackout, we are confident that the outcome of the proceedings would not have been different as

---

[16] Affidavit of Dr. W of 3 Oct 2017 at 2.

there was no active participation by FN CR in any sexual act for her to remember or for the members to consider.

### 3. Failure to introduce the testimony of Nurse B

The appellant contends that after LT Z had been permitted to testify concerning tonic immobility, had his trial defense counsel called Nurse B, his sexual assault forensic examination expert, to rebut or challenge LT Z's testimony, the outcome of his proceedings would have been different. We do not agree.

As previously discussed, LT Z was qualified to provide the testimony she provided at trial. Once LT Z's testimony was before the members, the appellant's trial defense team was faced with the decision of whether to challenge the reliability of LT Z's testimony or to minimize its impact. The affidavits of trial defense counsel explain the tactical reasons behind their decision not to call Nurse B to testify before the members. First, presuming Nurse B would testify substantially as she did before the military judge, counsel reasoned further testimony on tonic immobility from Nurse B posed more disadvantages than advantages. Nurse B would have to concede that as a sexual assault nurse examiner she was trained on tonic immobility, and its causes and symptoms. Instead of allowing the government to again focus the members on LT Z's opinion and the facts supporting her observations, counsel chose not to call Nurse B as a witness. Second, counsel reasoned that tonic immobility was not inconsistent with their overall theory and defense in the case—that the appellant held a reasonable mistake of fact as to FN CR's consent—in that after FN CR placed the appellant's hand on her vagina, initiating sexual contact, she did nothing to express her non-consent to any follow-on actions by the appellant.

The decision not to call Nurse B to testify was a tactical one that we are reluctant to second-guess absent a showing of unreasonableness under prevailing professional norms. *Mazza*, 67 M.J. at 475. Under the circumstances of this case, we do not find this tactical decision to be unreasonable.

### 4. Eliciting "human lie-detector" testimony from Special Agent M

The appellant contends that his trial defense counsel elicited improper human lie-detector testimony from Special Agent M during the following cross-examination exchange:

> [Defense]: Now you told [FN CR] when you interviewed her that this was an egregious case?
>
> [Special Agent M]: Yes, I did.
>
> [Defense]: That you wanted to prosecute?
>
> [Special Agent M]: Yes, I did.
>
> [Defense]: And you told her this on April 9th?

[Special Agent M]: Correct.

[Defense]: Before you interviewed anyone else?

[Special Agent M]: Yes, sir.

[Defense]: And before you had done any investigating?

[Special Agent M]: That is correct.[17]

The appellant argues, relying on *United States v. Birdsall,* 47 M.J. 404 (C.A.A.F. 1998), that this exchange was the functional equivalent of human lie-detector testimony because it had the effect of Special Agent M telling the members that she believed FN CR's allegation—that she had been sexually assaulted—which was the ultimate issue in question.

Impermissible human lie-detector testimony is "an opinion as to whether the person was truthful in making a specific statement regarding a fact at issue in the case." *United States v. Knapp,* 73 M.J. 33, 36 (C.A.A.F. 2014) (quoting *United States v. Brooks,* 64 M.J. 325, 328 (C.A.A.F. 2007)). Additionally, our superior court held that an opinion that is the "functional equivalent" of declaring that a victim should be believed is impermissible human lie-detector testimony. *Birdsall,* 47 M.J. at 410.

In *Birdsall,* the trial counsel elicited expert opinion testimony from their child sexual abuse expert that the children involved in the case were "victims of incest by their father," Master Sergeant Birdsall. *Id.* When testifying, the expert made it clear that her opinion was based on the children's statements regarding the alleged acts of Master Sergeant Birdsall upon them. *Id.* And, the expert prefaced her "testimony with an assertion that she was qualified to distinguish between founded and unfounded cases of child sexual abuse." *Id.*

The appellant's reliance on *Birdsall* is misplaced. The testimony in question is plainly calculated to demonstrate that the lead investigator jumped to premature conclusions and was biased in favor of FN CR's account. It is a reasonable, even common defense tactic well within professional norms.

We conclude it was not unreasonable for the trial defense counsel to offer Special Agent M's statement and its context in order to establish that Special Agent M conducted a biased investigation looking only for evidence of the appellant's guilt in her rush to judgment.

---

[17] Record at 375-76.

*5. Waiving objection to recorded statements made by the appellant to BM3 J*

The appellant also complains that his trial defense counsel is deficient for waiving any objection to irrelevant and inflammatory statements he made while being surreptitiously recorded by his friend, BM3 J. The appellant complains of two statements. "F[  ] it, I don't care. I'll go home."[18] And, "[i]f I get out of the Navy, I could just do whatever I want."[19] The appellant argues that not objecting to these statements was not a reasonable strategic choice. We disagree.

As stated above, we are mindful that we do not measure deficiency based on the success of a trial strategy, but on whether that strategy was reasonable in light of the "alternatives available at the time." *Dewrell,* 55 M.J. at 136 (citations omitted). In doing so, we must make "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland,* 466 U.S. at 689.

Although the statements were made during the same conversation, when placed back into context we find them not to be inflammatory. The first statement was made after BM3 J suggested that perhaps FN CR was making up the allegations to get out of the Navy—to which the appellant responded, "I don't know, what do I care. If you guys want to hem me up for something; hem me up for it. *F[  ] it, I don't care. I'll go home.*"[20] The second statement was made at the conclusion of the conversation after BM3 J had wished the appellant well in life—to which the appellant responded, *"[i]f I get out of the Navy, I could just do whatever I want.* I'll come see you every day."[21]

Further, we conclude the decision to not object to the entirety of the recorded conversation was a tactical and strategic decision made by the trial defense counsel. Again, the record is clear that the defense theory was mistake of fact as to consent. The strongest evidence in support of this theory was that, over a period of several months, the appellant had asserted on four separate occasions that FN CR had moved her bottom closer to him and then placed his hand on her vaginal area. Importantly, however, the first time the appellant provided this information it was to BM3 J, a person he considered a friend, someone to whom the members would not expect the appellant to lie. Given

---

[18] Appellant's Brief of 13 July 2018 at 8; AE XXVI at 83 (transcript of PE 5).

[19] Appellant's Brief of 13 July 2018 at 8; AE XXVI at 86 (transcript of PE 5).

[20] AE XXVI at 83 (transcript of PE 5) (emphasis added).

[21] AE XXVI at 86 (transcript of PE 5) (emphasis added).

the circumstances of this case, we find trial defense counsel's decision was reasonable.

## E. Sentence Disparity and Appropriateness

Although there were no companion cases to his court-martial, the appellant asserts that his case's disposition and sentence are disproportionately severe compared to other enlisted Sailors convicted of penetrative sexual offenses against adult victims over the past five years. He asks this court to approve confinement of only "three (3) years," in order to bring his sentence into line with other enlisted Navy offenders of penetrative sex offenses whose victims were adults.[22] We decline to do so.

### 1. Sentence disparity

Each "court-martial is free to impose any [legal] sentence it considers fair and just." *United States v. Turner*, 34 C.M.R. 215, 217 (C.M.A. 1964). Therefore, "[t]he military system must be prepared to accept some disparity . . . provided each military accused is sentenced as an individual." *United States v. Durant*, 55 M.J. 258, 261-262 (C.A.A.F. 2001) (discussing disparity in sentencing of codefendants) (citations omitted). In execution of this highly discretionary function, Article 66, UCMJ, does not require us to consider sentences in other cases, except when those cases are "closely related." *United States v. Ballard*, 20 M.J. 282, 283 (C.M.A. 1985); *United States v. Noble,* 50 M.J. 293, 294 (C.A.A.F. 1999); *United States v. Wacha*, 55 M.J. 266, 267 (C.A.A.F. 2001). As a general rule "sentence appropriateness should be determined without reference to or comparison with the sentences received by other offenders." *Ballard*, 20 M.J. at 283 (citations omitted). Notably, one narrow exception to this general principle of non-comparison exists. We are "required . . . 'to engage in sentence comparison with *specific cases* . . . in those rare instances in which sentence appropriateness can be fairly determined *only* by reference to disparate sentences adjudged in closely related cases.'" *Wacha*, 55 M.J. at 267 (citations omitted) (emphasis in original). When requesting relief by way of this exception, an appellant's burden is twofold: the appellant must demonstrate "that any cited cases are 'closely related' to his or her case and that the sentences are 'highly disparate.'" *United States v. Lacy*, 50 M.J. 286, 288 (C.A.A.F. 1999). If the appellant succeeds on both prongs, then the burden shifts to the government to "show that there is a rational basis for the disparity." *Id.* The purpose of sentence comparison in closely related cases is to achieve "relative uniformity." *United States v. Olinger,* 12 M.J. 458, 461 (C.M.A. 1982). Relative uniformity, however, does not mean "an arithmetically averaged sentence." *Id.*

---

[22] Appellant's Brief of 4 Dec 2018 at 77.

For cases to be considered closely related, "the cases must involve offenses that are similar in both nature and seriousness or which arise from a common scheme or design." *United States v. Kelly*, 40 M.J. 558, 570 (N.M.C.M.R. 1994). This threshold requirement can be satisfied by evidence of "co[-]actors involved in a common crime, servicemembers involved in a common or parallel scheme, or some other direct nexus between the servicemembers whose sentences are sought to be compared." *Lacy*, 50 M.J. at 288-89 (finding cases were closely related "where appellant and two other Marines engaged in the same course of conduct with the same victim in each other's presence").

Here, the appellant's request for sentence comparison and relief is based on his assertion that his sentence to 10 years' confinement, violates the principle of general sentence uniformity. In support of his argument, the appellant offers: (1) a chart of court-martial sentences of all Sailors purportedly convicted of sexual penetrative offenses against adult victims from January 2013 through October 2017; and (2) the court-martial sentences of three specific enlisted Sailors convicted of sexual penetrative offenses. These cases do not constitute closely related cases. Nor do they constitute all of the cases involving sexual penetrative offenses under this court's cognizance during the asserted timeframe—as the Navy-Marine Corps Court of Criminal Appeals we also review Marine Corps cases.

The appellant cannot identify any "close relationship" between the appellant's case and those he references, except they involve Sailors convicted of sexual penetrative offenses. Far from being "co[-]actors" or "servicemembers involved in a common or parallel scheme," the appellant's offenses and those committed by the other offenders he cites took place at different times, at different commands, in different locations, and involved unrelated victims under differing factual circumstances. *Lacy,* 50 M.J. at 288. Additionally, although all involve sexual penetrative offenses, "it is simply not possible to assess the multitude of aggravating and mitigating sentencing factors considered" by the sentencing authority in reaching the sentences adjudged in the cases offered for comparison. *Ballard,* 20 M.J. at 285. Therefore, we find no "direct nexus" between the appellant's misconduct and that of his offered comparison cases. *Lacy,* 50 M.J. at 288.

The appellant has failed to carry his dual burden of showing a closely related case with an adjudged sentence to warrant comparison. However, even if we considered the offered comparison cases to be closely related, the differences in the appellant's sentence and those of the offered comparison cases are well within the range of what we would expect different courts-martial, made up of different members, carrying out their obligation to determine an appropriate sentence based on an individualized evaluation of the offenses and the offenders before them, might reach. Further, in the execution of our Article 66, UCMJ, "responsibility to maintain general sentence uniformity among cases

under our cognizance," we have considered the appellant's sentence as it compares to all cases under our cognizance—not just that of recent cases involving enlisted Sailors. *United States v. Schnable*, 65 M.J. 566, 574 (N-M. Ct. Crim. App. 2006) (in granting relief this Court further noted factors that tended to extenuate or mitigate the appellant's offenses). Many of the cases that come before this court involve adult victim penetrative sex offense. Based on our knowledge of these cases, we note numerous sentences of both Sailors and Marines, officer and enlisted alike, convicted of sexual penetrative offenses wherein the approved sentence was close to or exceeded that adjudged in the appellant's case. Accordingly, we find no unfairness or injustice in this proceeding to erase. *Olinger,* 12 M.J. at 461.

### 2. Sentence appropriateness

Apart from the comparative analysis, we evaluate the appellant's sentence on its own facts as part of our Article 66(c), UCMJ review. *See United States v. Baier*, 60 M.J. 382, 384-85 (C.A.A.F. 2005).[23] We review sentence appropriateness *de novo. United States v. Lane,* 64 M.J. 1, 2 (C.A.A.F. 2006). This court "may affirm only . . . the sentence or such part or amount of the sentence, as it . . . determines, on the basis of the entire record, should be approved." Art. 66(c), UCMJ. "Sentence appropriateness involves the judicial function of assuring justice is done and that the accused gets the punishment he deserves." *United States v. Healy,* 26 M.J. 395, 395 (C.M.A. 1988). Assessing sentence appropriateness requires "individualized consideration of the particular accused on the basis of the nature and seriousness of the offense and the character of the offender." *United States v. Snelling,* 14 M.J. 267, 268 (C.M.A. 1982) (citation and internal quotation marks omitted). Despite our significant discretion in reviewing the appropriateness and severity of an adjudged sentence, we cannot engage in acts of clemency. *United States v. Nerad,* 69 M.J. 138, 146 (C.A.A.F. 2010).

The appellant stands convicted of having sexually assaulted a fellow Sailor, and having wrongfully used a Schedule I controlled substance. At the time of his misconduct, the appellant had approximately 42 months' of credible service. Having given individualized consideration to the appellant, the nature and seriousness of his offenses, his character, record of service, and all other matters contained in the record, we find that the sentence adjudged by the members in this case—120 months' confinement, reduction to pay grade E-1, and a dishonorable discharge—was not inappropriately severe. In making this

---

[23] *See also United States v. Snelling*, 14 M.J. 267, 268 (C.M.A. 1982) ("However proper it may be for the convening authority and [Courts of Criminal Appeals] to consider sentence comparison as an aspect of sentence appropriateness, it is only one of many aspects of that consideration." (citations omitted)).

determination, we understand full well that our authority under Article 66(c), UCMJ, to disapprove any sentence is not constrained by Article 56, UCMJ. *See United States v. Kelly,* 77 M.J. 404, 408 (C.A.A.F. 2018) (holding that because Congress has not explicitly limited this court's Article 66(c), UCMJ, review powers, and until it does this court retains "the power to disapprove" any Article 56, UCMJ, mandated minimum sentence). We decline to disapprove any portion of the appellant's adjudged sentence because, under the circumstances of this case, we are convinced that justice was done, and the appellant received the punishment—including the dishonorable discharge—he deserved. *Healy,* 26 M.J. at 395.

**F. Cumulative Error**

We review *de novo* the cumulative effect of all plain and preserved error. *United States v. Pope,* 69 M.J. 328, 335 (C.A.A.F. 2011). "Under the cumulative-error doctrine, a number of errors, no one perhaps sufficient to merit reversal, in combination necessitate the disapproval of a finding." *Id.* (citation and internal quotation marks omitted). We are to reverse only if we find any cumulative errors to have denied the appellant a fair trial. *Id.* Finding no material error in this case, there is no cumulative error.

## III. CONCLUSION

The findings and sentence approved by the CA are affirmed.

Judge CRISFIELD and Judge HITESMAN concur.

FOR THE COURT

RODGER A. DREW, JR.
Clerk of Court